[858 NE2d 772, 825 NYS2d 178]

In the Matter of AZRIEL RECKESS et al., Respondents, v NEW YORK STATE COMMISSION ON QUALITY OF CARE FOR THE MENTALLY DISABLED, Appellant.

Argued October 11, 2006; decided November 16, 2006

*Eliot Spitzer, Attorney General,* Albany (*Kathleen M. Treasure, Caitlin J. Halligan, Daniel Smirlock* and *Peter H. Schiff* of counsel), for appellant. Petitioners' possession of records pertaining to the financial operations of their adult homes in their capacity as owners of related realty corporations does not shield those records from the Commission on Quality of Care for the Mentally Disabled's review. (*Majewski v Broadalbin-Perth Cent. School Dist.,* 91 NY2d 577; *Matter of Worldwide Mgt. Consultants,* 109 AD2d 626, 65 NY2d 911; *Matter of Edge Ho Holding Corp.,* 256 NY 374; *Matter of Parisi v Waterfront Commn. of N.Y. Harbor,* 79 AD2d 967, 53 NY2d 914.)

*Hinman Straub, P.C.,* Albany (*James T. Potter* of counsel), for respondents. I. The Commission on Quality of Care for the Mentally Disabled lacks the statutory authority to subpoena the private financial records of property owners leasing to adult homes. (*Matter of Irwin v Board of Regents of Univ. of State of N.Y.,* 27 NY2d 292; *Matter of Whalen v John P.,* 72 AD2d 961; *Beacway Operating Corp. v Concert Arts Socy.,* 123 Misc 2d 452; *Union Theol. Seminary v Harris,* 1 Misc 3d 909; *Matter of Worldwide Mgt. Consultants,* 109 AD2d 626, 65 NY2d 911; *Matter of Parisi v Waterfront Commn. of N.Y. Harbor,* 79 AD2d 967, 53 NY2d 914; *Matter of Edge Ho Holding Corp.,* 256 NY 374.) II. The subpoenaed information is irrelevant to a proper subject of inquiry. (*Matter of Eastern Indus. Supply Corp. v Waterfront Commn. of N.Y. Harbor,* 96 AD2d 469; *Matter of Horn Constr. Co. v Fraiman,* 34 AD2d 131, 29 NY2d 559.)

## OPINION OF THE COURT

GRAFFEO, J.

We are asked in this case whether respondent New York State Commission on Quality of Care for the Mentally Disabled had the authority to issue subpoenas seeking documents from petitioners, the operators of several adult care facilities, relating

to mortgages that they secured through realty holding companies. We hold that the subpoenas are enforceable under Mental Hygiene Law §§ 45.09 and 45.10.

Petitioners Azriel and Paula Reckess operate five adult homes in Dutchess, Rockland and Ulster counties that provide long-term residential care and services to persons who are incapable of living independently, including some residents who would otherwise require placement in a nursing home.[1] The facilities are licensed by the State Department of Health (*see* Social Services Law § 460-b [1]; § 461-b [2] [a]; L 1997, ch 436, part B, § 122 [e]; *see also People v Cuttita*, 7 NY3d 500, 503 [2006]) and petitioners receive a per diem, flat-rate reimbursement from state and federal sources for eligible residents, rather than the cost-plus reimbursement that is provided to nursing homes. In addition, because certain residents obtain services from mental health providers, petitioners' adult homes are also subject to oversight by the New York State Commission on Quality of Care for the Mentally Disabled (the Commission) (*see* Mental Hygiene Law § 45.10 [a]), an agency created to monitor mental hygiene programs and to help ensure that "the quality of care provided to persons with mental disabilities in the state is of a uniformly high standard" (Mental Hygiene Law § 45.07 [a]).[2]

In 2003, pursuant to its authority to examine the finances of any adult home in which at least 25 or 25% of the residents receive services from a mental health provider (*see* Mental Hygiene Law § 45.10 [a] [2]), the Commission conducted a financial review of four of petitioners' facilities—Golden Acres Home for Adults, Village View Home for Seniors, Dutchess Manor Home for Adults and Avalon Assisted Living. Those properties were originally owned and operated by separate partnerships created by petitioners. But the Commission's examination revealed that title to the real property had been transferred to limited liability companies that petitioners controlled[3] and these realty holding companies then leased the properties back to the

---

**1.** An "adult home" is defined by Social Services Law § 2 (25) as "an adult care facility established and operated for the purpose of providing long-term residential care, room, board, housekeeping, personal care, (either directly or indirectly), and supervision to five or more adults unrelated to the operator."

**2.** After this litigation commenced, the Commission merged with the New York State Office of Advocate for Persons with Disabilities and was renamed the New York State Commission on Quality of Care and Advocacy for Persons with Disabilities (*see* L 2005, ch 58, part H, § 4).

**3.** Petitioners indicate that in 2001 they transferred the limited liability company that owned the Avalon property to their children.

partnerships. Simply put, the holding companies became the landlords and the partnerships operating the homes paid rent to the holding companies.

The Commission further discovered that, from 1999 to 2001, petitioners' holding companies had refinanced the homes, dramatically raising the outstanding debt on the properties by over $10 million. For example, the mortgage indebtedness on Golden Acres increased by over $3 million and, as a result, the annual rent due the holding company grew from $173,300 to $522,000. Village View, Dutchess Manor and Avalon also sustained significant increases in mortgage indebtedness, which led to rents that were three to four times higher than before the refinancings.

Although petitioners provided the Commission with access to certain records maintained by the adult homes, they declined to produce other documents pertaining to the transfers of title to the homes and the subsequent refinancings. Concerned with the fiscal stability of the homes, the Commission issued subpoenas duces tecum to petitioners requesting "[a]ll information pertaining to mortgages" on the four adult homes, including "applications, appraisals, title insurance documents, closing statements, mortgage notes and all records executed at the mortgage closings." According to a Commission analyst, the Commission was interested in examining the actual costs of operation of the facilities in order to assess whether the increased debt load would impede petitioners' ability as operators to make timely mortgage payments and thereby "avoid potential foreclosure which could jeopardize the operations of the facilit[ies] and the individuals with disabilities who are receiving care." The Commission also sought to determine whether any improvements to the facilities had been made with the mortgage proceeds. At no time did the Commission allege that petitioners' transactions were improper or illegal.

Petitioners commenced this proceeding to quash the subpoenas, contending that the Commission lacked statutory authority to compel the production of documents executed by petitioners in their capacities as corporate officers of the realty holding companies, rather than as the operators of the adult homes. Supreme Court agreed, determining that although the Commission may demand information from "officers or employees" of an adult home pursuant to Mental Hygiene Law § 45.09 (a), the mortgage documents at issue related to the private finances of petitioners and were therefore beyond the subpoena authority

of the Commission. The Appellate Division affirmed. We now reverse.

The power to issue a subpoena exists only when it is expressly granted by the Legislature (*see Matter of Irwin v Board of Regents of Univ. of State of N.Y.*, 27 NY2d 292, 297 [1970]; *see generally Matter of Shankman v Axelrod*, 73 NY2d 203, 206 [1989]). Mental Hygiene Law §§ 45.09 and 45.10 provide the Commission with a statutory basis to execute subpoenas. Section 45.09 specifically allows the Commission to "issue and enforce a subpoena and a subpoena duces tecum" (Mental Hygiene Law § 45.09 [c]) to review the "programmatic and financial operations" of certain adult homes, among other purposes (Mental Hygiene Law § 45.10 [a] [2]). The Commission may demand that the "officers or employees of an adult home" disclose "any information deemed necessary" for such an examination (Mental Hygiene Law § 45.09 [a]).

The plain language of these provisions supplies the legislative authorization for the issuance of subpoenas by the Commission in this case. Petitioners concede that they are "officers" of the adult homes (Mental Hygiene Law § 45.09 [a]; *see* Social Services Law § 461-b [1] [a]), as well as officers of the holding companies. Because the statutes allow the Commission to subpoena "any information" (Mental Hygiene Law § 45.09 [a]) in an officer's possession that is relevant to the Commission's mandate—and the financial stability of an adult care facility surely is (*see* Mental Hygiene Law § 45.10 [a] [2])—section 45.09, on its face, enables the Commission to review documents in petitioners' possession that pertain to the fiscal operations of their adult homes. This is particularly true where, as here, the sale-leaseback arrangements resulted in significant rental increases that could affect the viability of the continued operation of the homes or the extent of services provided to the residents. In other words, the Commission may subpoena documents held by adult home officers or corporations they control that were used in the sale-leaseback transactions and the related refinancings in order to gauge the financial stability of the adult homes. Therefore, the fact that the mortgage and closing documents were executed by petitioners as officers of the holding companies does not deprive the Commission of its oversight and subpoena-issuing authority (*cf. Matter of Worldwide Mgt. Consultants [Waterfront Commn. of N.Y. Harbor]*, 65 NY2d 911, 913 [1985], *affg* 109 AD2d 626 [1st Dept 1985]; *Matter of Parisi v Waterfront Commn. of N.Y. Harbor*, 53 NY2d 914, 915 [1981],

*affg* 79 AD2d 967 [1st Dept 1981]; *Matter of Edge Ho Holding Corp.*, 256 NY 374, 380 [1931]).

The facts of this case justify the Commission's exercise of its subpoena power. Petitioners are in the business of providing residential care to the elderly and mentally disabled. To ensure that adequate services are provided to these vulnerable citizens, adult care facilities are regulated by the State and the Commission's oversight authority includes directives to review the cost effectiveness of programs (*see* Mental Hygiene Law § 45.07 [b]), assess the quality of care extended to residents (*see* Mental Hygiene Law § 45.07 [e]) and examine the financial stability of adult homes (*see* Mental Hygiene Law § 45.10 [a] [2]). Here, although the Commission has not assigned a nefarious purpose to the sale-leaseback arrangements and refinancings, petitioners' actions have resulted in a significant increase in the mortgage debt carried by their adult homes, which translates to substantially higher rental obligations owed by the partnerships operating the homes. Under these circumstances, and because petitioners control the realty holding companies and the adult home partnerships, we agree with the Commission that its ability to review the transactions at issue should not be defeated by petitioners' corporate status.[4] Consequently, the Commission did not exceed its statutory authority when it issued subpoenas directing petitioners to disclose documents held by the realty holding companies they control that pertain to the financial stability of the adult homes they operate.

Accordingly, the order of the Appellate Division should be reversed, with costs, and the petition dismissed.

Chief Judge KAYE and Judges CIPARICK, READ, SMITH and PIGOTT concur; Judge ROSENBLATT taking no part.

Order reversed, etc.

---

4. There is an additional justification for an examination by the Commission in this type of situation. One of the Commission's duties is to analyze the statewide costs of mental hygiene programs, identify the causes for rising costs and propose means for controlling cost increases (*see* Mental Hygiene Law § 45.07 [b]). Upon completion of an investigation of an adult home's financial operations, the Commission may make findings and issue a report to the facility's operator and the commissioner of any appropriate agency (*see* Mental Hygiene Law § 45.07 [f] [2]; [g]; § 45.10 [b]). Thus, if the Commission conducts a review of a questionable practice by an adult home and concludes that it may result in escalating health-care costs if adopted by other facilities, the Commission may recommend that the practice be restricted or prohibited.