[968 NE2d 967, 945 NYS2d 613]

In the Matter of ALBANY LAW SCHOOL et al., Respondents-Appellants, v NEW YORK STATE OFFICE OF MENTAL RETARDATION AND DEVELOPMENTAL DISABILITIES et al., Appellants-Respondents.

Argued March 19, 2012; decided April 26, 2012

**POINTS OF COUNSEL**

*Eric T. Schneiderman, Attorney General*, Albany (*Victor Paladino, Barbara D. Underwood, Andrea Oser* and *Nancy A. Spiegel* of counsel), for appellants-respondents. I. The Mental Hygiene Law does not grant petitioners unfettered access to clinical records. (*Matter of Dutchess County Dept. of Social Servs. v Day*, 96 NY2d 149; *Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577; *Riley v County of Broome*, 95 NY2d 455.) II. "Actively involved family members" are "legal representatives" from whom the State may require petitioners to seek consent before accessing patient records. (*Office of Protection & Advocacy for Persons with Disabilities v Armstrong*, 266 F Supp 2d 303; *Alabama Disabilities Advocacy Program v J.S. Tarwater Dev. Ctr.*, 894 F Supp 424; *State of Conn. Off. of Protection & Advocacy for Persons with Disabilities v Hartford Bd. of Educ.*, 355 F Supp 2d 649; *Washington State Dept. of Social & Health Servs. v Guardianship Estate of Keffeler*, 537 US 371.)

*Disability Advocates, Inc.*, Albany (*Jennifer J. Monthie, Timothy A. Clune* and *Cliff Zucker* of counsel), *Patterson Belknap Webb & Tyler LLP*, New York City (*Christopher Jackson* of counsel), and *Albany Law School Civil Rights & Disabilities*

*Law Clinic*, Albany (*Bridgit Burke* of counsel), for respondents-appellants. I. Albany Law School and Disability Advocates, Inc. are entitled to the requested records pursuant to Mental Hygiene Law § 33.13 (c) (4) and § 45.09 (b). (*Finger Lakes Racing Assn. v New York State Racing & Wagering Bd.*, 45 NY2d 471; *Matter of Orens v Novello*, 99 NY2d 180; *Kramer v Phoenix Life Ins. Co.*, 15 NY3d 539; *Matter of Rosen v Public Empl. Relations Bd.*, 72 NY2d 42; *Riley v County of Broome*, 95 NY2d 455; *Crane Neck Assn. v New York City/Long Is. County Servs. Group*, 61 NY2d 154; *Matter of Green Harbour Homeowners' Assn. v Town of Lake George Planning Bd.*, 1 AD3d 744; *Matter of Gruber [New York City Dept. of Personnel—Sweeney]*, 89 NY2d 225; *Rovello v Orofino Realty Co.*, 40 NY2d 633; *Biondi v Beekman Hill House Apt. Corp.*, 257 AD2d 76, 94 NY2d 659.) II. The Appellate Division correctly held that "actively involved family members" are not "legal representatives." (*Rovello v Orofino Realty Co.*, 40 NY2d 633; *Biondi v Beekman Hill House Apt. Corp.*, 257 AD2d 76, 94 NY2d 659; *Freitas v Geddes Sav. & Loan Assn.*, 63 NY2d 254; *Office of Protection & Advocacy for Persons with Disabilities v Armstrong*, 266 F Supp 2d 303; *Alabama Disabilities Advocacy Program v J.S. Tarwater Dev. Ctr.*, 97 F3d 492; *State of Conn. Off. of Protection & Advocacy for Persons with Disabilities v Hartford Bd. of Educ.*, 355 F Supp 2d 649; *Matter of Chaim A.K.*, 26 Misc 3d 837; *Olmstead v L. C.*, 527 US 581; *Crane Neck Assn. v New York City/Long Is. County Servs. Group*, 61 NY2d 154; *Ramapo Homeowners' Assn. v New York State Off. of Mental Retardation & Dev. Disabilities*, 180 F Supp 2d 519.) III. The courts below erred by striking portions of the petition. (*Riesenberger v Sullivan*, 1 AD2d 1050; *Pomerance v Pomerance*, 271 App Div 1027; *Giessler v Accurate Brass Co., Inc.*, 271 App Div 980; *Indelli v Lesster*, 130 App Div 548; *Solomon v La Guardia*, 267 App Div 435; *Merrick v New York Subways Adv. Co.*, 14 Misc 2d 456; *People v Till*, 87 NY2d 835; *Disability Advocates, Inc. v Paterson*, 598 F Supp 2d 289; *T.D. v New York State Off. of Mental Health*, 228 AD2d 95; *Riley v County of Broome*, 95 NY2d 455.)

*Paul Kietzman*, Delmar, for NYSARC, Inc., amicus curiae. I. Neither the federal statute involved herein, nor any other federal statute of which NYSARC, Inc. is aware, defines any of the terms used in 42 USC § 15043 (a) (2) (I) (i)—"guardian, conservator, or other legal representative." Such matters have always been dealt with in state law and in state courts. (*Matter of Grinker [Rose]*, 77 NY2d 703.) II. Formal guardianship is viewed both professionally and statutorily as a *non*-preferred remedy, to be reserved for when there is no other mechanism

available to support a person's own choices. Similarly, neither federal nor state law draw any "bright line" distinction between the authority of formally court-appointed surrogates and involved family members of incapacitated persons. (*Matter of Storar*, 52 NY2d 363; *Matter of M.B.*, 6 NY3d 437.) III. In the event that this Court affirms the holding of the Appellate Division, Third Department, and adopts respondents' position that involved family members will not be recognized as legal representatives, the certain result is that *formal* guardianships will be reluctantly pursued, burdening not just the judiciary but the lives, personal autonomy and freedoms of the individuals that appellants are charged with safeguarding. IV. As a matter of New York statute and regulation, both the Office for People with Developmental Disabilities and the courts have a regular power of review over decisions of involved family members, who are categorically *not* persons who only handle financial affairs, attorneys who represent persons with intellectual or other developmental disabilities on singular occasions, or administrators of service providers. (*Society for Good Will to Retarded Children, Inc. v Cuomo*, 902 F2d 1085.)

*Wilmer Cutler Pickering Hale and Dorr LLP*, New York City (*Fraser L. Hunter, Jr., David F. Olsky* and *Edward Sherwin* of counsel), for National Disability Rights Network and others, amici curiae. I. Congress and the State Legislature intended that protection and advocacy agencies actively investigate facilities serving individuals with developmental disabilities. (*Matter of Siwek v Mahoney*, 39 NY2d 159; *Affronti v Crosson*, 95 NY2d 713; *Riley v County of Broome*, 95 NY2d 455.) II. Protection and advocacy agencies need access to the clinical records of people with developmental disabilities in order to discharge their statutory duties. (*Indiana Protection & Advocacy Servs. v Indiana Family & Social Servs. Admin.*, 603 F3d 365; *Alabama Disabilities Advocacy Program v J.S. Tarwater Dev. Ctr.*, 894 F Supp 424, 97 F3d 492; *Robbins v Budke*, 739 F Supp 1479.) III. The Office for People with Developmental Disabilities should not be permitted to obstruct protection and advocacy investigations by requiring them to first seek permission from "involved" family members. (*Alabama Disabilities Advocacy Program v J.S. Tarwater Dev. Ctr.*, 97 F3d 492; *Pennsylvania Protection & Advocacy, Inc. v Houstoun*, 228 F3d 423; *Advocacy Ctr. v Stalder*, 128 F Supp 2d 358; *Oklahoma Disability Law Ctr., Inc. v Dillon Family & Youth Servs., Inc.*, 879 F Supp 1110; *Robbins v Budke*, 739 F Supp 1479.)

**OPINION OF THE COURT**

GRAFFEO, J.

Petitioners Albany Law School and Disability Advocates, Inc. provide protection and advocacy services to individuals with developmental disabilities pursuant to contracts with the New York State Commission on Quality of Care and Advocacy for Persons with Disabilities, an agency that oversees New York's protection and advocacy system. After receiving a complaint regarding the discharge practices of respondent New York State Office of Mental Retardation and Developmental Disabilities— now the Office for People with Developmental Disabilities (OPWDD)—petitioners requested access to the clinical records of all individuals residing at two OPWDD facilities to investigate whether they were being denied the opportunity to live in less restrictive settings. Relying on Mental Hygiene Law § 45.09 (b) and § 33.13 (c) (4), petitioners asserted that they were entitled to unrestricted access to the clinical records.

OPWDD disagreed, taking the position that the two Mental Hygiene Law provisions cited by petitioners incorporate the records access procedures established in the federal Developmental Disabilities Assistance and Bill of Rights Act, which were designed to balance the privacy rights of developmentally disabled persons with the need of protection and advocacy organizations to access residents' personal information in order to investigate complaints and advocate on behalf of those individuals. In accordance with federal law, OPWDD agreed to provide records pertaining to residents for whom petitioners had obtained authorization, either from the individuals themselves or their legal representatives (which, in OPWDD's view, included actively-involved family members), and for individuals who were unable to provide authorization and did not have a legal representative.

This case requires us to decide two significant issues that implicate competing interests with regard to the clinical records of developmentally disabled persons. First, whether Mental Hygiene Law § 45.09 (b) and § 33.13 (c) (4) provide petitioners with unqualified access to clinical and other records or whether the state statutes embrace the access provisions in federal law. And second, whether actively-involved family members can be deemed legal representatives for purposes of the federal and state access provisions. We conclude that section 45.09 (b) and section 33.13 (c) (4) must be read in accord with federal law and that actively-involved family members can possess sufficient

decision-making authority to qualify as legal representatives under the pertinent regime.

## I.

In 1975, in response to the deplorable conditions revealed at New York's Willowbrook State School and other state-operated facilities, Congress enacted the Developmental Disabilities Assistance and Bill of Rights Act (the DD Act).[1] The DD Act was designed to encourage states to safeguard the rights of individuals with developmental disabilities by offering federal funds to states with an effective protection and advocacy (P&A) system (*see Virginia Office for Protection and Advocacy v Stewart*, 563 US —, —, 131 S Ct 1632, 1635-1636 [2011]). To qualify for funding, a state's P&A system must, among other powers, "have the authority to investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred" (42 USC § 15043 [a] [2] [B]). The P&A system must also be able to "pursue legal, administrative, and other appropriate remedies . . . to ensure the protection of, and advocacy for, the rights of such individuals" (42 USC § 15043 [a] [2] [A] [i]).

In 1984, Congress amended the DD Act to require states, as a condition to maintaining eligibility for federal funding under the program, to grant their P&A systems access to the records of individuals with developmental disabilities subject to certain requirements (*see* Pub L 98-527, § 142, 98 US Stat 2662, 2679-2680 [98th Cong, 2d Sess, Oct. 19, 1984], amending 42 USC former § 6042 [a]). The 1984 amendment gave the states until October 1986 to implement these access requirements (*see id.*). In particular, the DD Act currently describes four sets of circumstances under which a P&A entity must be given access to the clinical and other records of developmentally disabled persons.

First, the P&A organization is entitled to "immediate access," without the consent of any person, if it "determines there is probable cause to believe that the health or safety of the individual is in serious and immediate jeopardy" (42 USC § 15043 [a] [2] [J] [ii] [I]) or if the individual dies (*see* 42 USC § 15043

---

**1.** The DD Act of 1975 (42 USC § 6001 *et seq.*) was repealed and incorporated into the DD Act of 2000 (42 USC § 15001 *et seq.*), which retained the name of the act and most of its provisions.

[a] [2] [J] [ii] [II]). In these emergency or death situations, Congress determined that facilities must provide immediate, full record access in order to protect the health and safety of the resident or, in the case of death, to timely commence an investigation.

Second, in nonemergencies, the facility must grant access to the P&A organization if authorization is given by the individual or the individual's "legal guardian, conservator, or other legal representative" (42 USC § 15043 [a] [2] [I] [i]). Not all developmentally disabled persons residing in facilities are incompetent to participate in medical and therapy decision-making or decisions relating to training or residential choices. Federal law acknowledges the right of these residents who are consistently involved in the management of their own care to be notified and to authorize or deny access, recognizing the reasonable privacy expectations of these individuals in their personal information and their right to make decisions regarding their own treatment and welfare.

Third, a P&A entity is to be afforded access where (a) the individual is incapable of granting authorization; (b) the individual does not have a legal representative; and (c) the system has received a complaint with regard to the individual's treatment or, as a result of monitoring activities, there is probable cause to believe that the individual has been abused or neglected (see 42 USC § 15043 [a] [2] [I] [ii]). Clearly, the DD Act recognizes the imperative need of P&A organizations to protect and advocate on behalf of residents who are not capable of providing authorization and lack a legal representative. Even without receiving a complaint, if P&A personnel have probable cause to believe that a resident has been neglected or abused—reflecting the importance of on-site monitoring activities by P&A organizations—they may demand record access to investigate the circumstances and safeguard the resident at risk.

Finally, access is mandated if (a) the individual has a legal representative; (b) the P&A entity has received a complaint with regard to the individual's treatment or, as a result of monitoring activities, there is probable cause to believe that the individual has been abused or neglected; and (c) the P&A entity has contacted the legal representative and offered assistance but the representative has failed or refused to act on the individual's behalf (see 42 USC § 15043 [a] [2] [I] [iii]). In non-emergency situations, the records of individuals who lack the

ability to consent but who have a legal representative (according to OPWDD, this is fairly common) must therefore be disclosed if the legal representative grants authorization (category two) or if the legal representative fails or refuses to act in response to a complaint or probable cause (category four). Again, if the situation is such that the health or safety of the resident is in "serious" or "immediate jeopardy," the immediate access provisions of category one would instead apply.

In short, in amending the DD Act, Congress acknowledged the necessity of allowing P&A entities record access in order to fulfill their "watchdog" role. Yet, Congress also considered the right of competent individuals or legal representatives acting on behalf of developmentally disabled persons to participate in the decision to disclose their records—some of which may contain sensitive, personal information. Therefore, federal law established a carefully calibrated system that took into consideration both the privacy interests of developmentally disabled persons and the need for P&A organizations to examine records in order to pursue their statutory functions.

Following the adoption of the DD Act, the New York Legislature created what is now known as the Commission on Quality of Care and Advocacy for Persons with Disabilities (the Commission) to oversee the care, treatment and delivery of services to individuals who are developmentally disabled (L 1977, ch 655; *see also* Mental Hygiene Law art 45). The Commission is empowered to review the operations of the Department of Mental Hygiene, which includes OPWDD, and to investigate complaints pertaining to the treatment and care of individuals who are patients or residents of any facility providing services to developmentally disabled persons (*see* Mental Hygiene Law § 45.07; *see generally Matter of Reckess v New York State Commn. on Quality of Care for Mentally Disabled*, 7 NY3d 555, 560 [2006]). The Legislature vested the Commission with the power to inspect all books and records of mental hygiene facilities "deemed necessary for carrying out the commission's functions, powers and duties" (Mental Hygiene Law § 45.09 [a]). The Commission is also the agency designated under the DD Act to administer the P&A system to ensure continued federal funding (*see* Mental Hygiene Law § 45.07 [p]). It administers its P&A responsibilities, in part, through contracts with independent P&A organizations, such as petitioners (*see* Mental Hygiene Law § 45.07 [i]). Hence, in New York the Commission itself serves as the State's P&A system while P&A entities like petitioners function as contractors to the system (*see generally*

*Disability Advocates, Inc. v New York Coalition for Quality Assisted Living, Inc.*, 675 F3d 149 [2d Cir 2012]).

Although the Commission has been granted broad access to facility records since its inception (*see* L 1977, ch 655; *see also* Mental Hygiene Law § 45.09 [a]), state law did not originally afford P&A organizations that contract with the Commission an independent right to examine the clinical records of developmentally disabled individuals. In response to the 1984 amendments to the DD Act—which conditioned the continued eligibility for federal funding on allowing such entities access to records—the Legislature amended the Mental Hygiene Law in 1986 to address the access rights of these P&A organizations (*see* L 1986, ch 184).

Specifically, the Legislature added Mental Hygiene Law § 45.09 (b), which provides, in relevant part:

> "Pursuant to the authorization of the commission to administer the protection and advocacy system as provided for by federal law, any agency or person within or under contract with the commission which provides protection and advocacy services must be granted access at any and all times to any facility, or part thereof, serving a person with a disability operated or licensed by any office or agency of the state, and to all books, records, and data pertaining to any such facility upon receipt of a complaint by or on behalf of a person with a disability."

The 1986 legislation simultaneously amended Mental Hygiene Law § 33.13, the provision that secures the confidentiality of clinical records in the possession of OPWDD or the Office of Mental Health absent enumerated exceptions, by adding the following emphasized language to subdivision (c) (4):

> "(c) Such information about patients or clients reported to the offices . . . shall not be released by the offices or its facilities to any person or agency outside of the offices except as follows: . . .
>
> "4. to the commission on quality of care for the mentally disabled *and any person or agency under contract with the commission which provides protection and advocacy services pursuant to the authorization of the commission to administer the protection and advocacy system as provided for by federal law*."

This remains the current state statutory scheme governing P&A record access.

## II.

In 2008, petitioners, as P&A organizations under contract with the Commission, wrote to OPWDD requesting review of the records of more than 200 residents at two facilities operated by OPWDD—the Capital District and Taconic Developmental Disabilities Service Offices. The requests indicated that petitioners had received a "complaint of neglect" pertaining to the discharge policies at the Taconic facility and that, as a result of monitoring activities at the Capital District facility, petitioners were concerned about the timeliness of the transfer of individuals into more integrated placements—clearly an issue within petitioners' advocacy responsibilities. Petitioners claimed that they were entitled to unrestricted access to the documents pursuant to Mental Hygiene Law § 45.09 (b) and § 33.13 (c) (4).

OPWDD rejected petitioners' contention that they had full access to the clinical records under these circumstances and asserted that section 45.09 (b) and section 33.13 (c) (4) required petitioners to comply with the federal procedures prescribed by the DD Act. Consequently, OPWDD agreed to provide the records of individuals for whom petitioners had obtained authorization and the records of individuals who were incapable of providing authorization and had no legal representative.[2] But OPWDD indicated that access could not be provided for individuals who had legal representatives unless petitioners first notified those legal representatives (most of whom were actively-involved family members rather than formal guardians). In the event those legal representatives gave consent or failed or refused to act, OPWDD represented that petitioners would be entitled to access in accordance with federal procedures. OPWDD further advised petitioners that it would provide the contact information for these legal representatives to allow petitioners to seek their consent. Petitioners declined to obtain the authorizations or contact the individuals' representatives, reiterating their view that state law required access without notice or consent considerations.

As a result of this conflict over the proper procedures governing record access, petitioners brought this combined CPLR

---

2. Although OPWDD questioned whether there was probable cause to believe that the individuals were being neglected, it stated that it would provide the records if petitioners otherwise satisfied the federal access criteria.

article 78 proceeding and action pursuant to 42 USC § 1983 against OPWDD and its Commissioner (collectively, OPWDD) to enforce their right of access to all clinical records at the Taconic and Capital District facilities. According to the petition/complaint, there was evidence that OPWDD was neglecting the care of individuals residing at the two facilities both through "the denial of rights to live in less restrictive settings and the failure to provide necessary treatment that would prepare and enable individuals with disabilities to live in such settings." Petitioners asked the court to issue an order compelling OPWDD to provide prompt access to the residents' clinical records pursuant to Mental Hygiene Law § 45.09 (b) and § 33.13 (c) (4). Alternatively, they requested an order obligating OPWDD to provide the records of individuals without a legal representative under 42 USC § 15043 (a) (2) (I) (ii), and they maintained that actively-involved family members were not legal representatives for purposes of record access.

OPWDD moved to dismiss under CPLR 3211 for failure to state a cause of action. In the alternative, OPWDD requested that the court strike certain paragraphs of the petition/complaint as prejudicial and irrelevant under CPLR 3024 (b).[3] In support of its dismissal motion, OPWDD included an affidavit from the Commission's chief operating officer explaining the Commission's view that the access rights of P&A organizations under contract with it, such as petitioners, were not coextensive with the Commission's expansive authority established by Mental Hygiene Law § 45.09 (a). Instead, the Commission concurred with OPWDD's view that section 45.09 (b) and section 33.13 (c) (4) incorporated the federal criteria set forth in the DD Act. OPWDD also submitted affidavits from the executive director of Parent to Parent of NYS and the president of the Self-Advocacy Association of New York State, two not-for-profit advocacy organizations, opposing petitioners' assertion of blanket authority and emphasizing the privacy interests developmentally disabled persons and their families have in their sensitive medical records.

Supreme Court granted OPWDD's motion in part. The court agreed with OPWDD that Mental Hygiene Law § 45.09 (b) and § 33.13 (c) (4) adopted the federal access procedures and

---

**3.** The paragraphs at issue described the "inhumane conditions" of the Willowbrook State School in the 1970s and the 2007 death of a child in OPWDD's care in an unrelated case.

therefore did not grant petitioners access to the records at issue absent compliance with the federal requirements. The court also determined that legal representatives, for purposes of the federal regime, could include actively-involved family members. Finally, the court struck a number of paragraphs from the petition/complaint pursuant to CPLR 3024 (b).[4]

The Appellate Division modified (81 AD3d 145 [3d Dept 2011]). The Court concurred with Supreme Court's conclusion that Mental Hygiene Law § 33.13 (c) (4) did not afford petitioners unrestricted access to clinical records but, rather, required petitioners to comply with the DD Act's requirements. Yet the Court reached a different conclusion regarding Mental Hygiene Law § 45.09 (b), holding that it authorized access to petitioners upon receipt of a complaint because that statute was not structured to incorporate the federal access requirements. The Court further disagreed with Supreme Court's determination that actively-involved family members can be legal representatives for purposes of the federal notice provisions, reasoning that they lack the authority to make "all decisions" on behalf of their developmentally disabled relatives (81 AD3d at 152). Finally, the Court ruled that Supreme Court did not err in striking out portions of the petition/complaint.

The Appellate Division granted OPWDD and petitioners leave to appeal on a certified question.

### III.

On this appeal, OPWDD argues that the Mental Hygiene Law does not grant P&A organizations under contract with the Commission unrestricted access to clinical records. Rather, OPWDD contends that Mental Hygiene Law § 45.09 (b) authorizes petitioners to review patient records only in accordance with the four categories of access procedures enumerated in the DD Act. OPWDD further asserts that Mental Hygiene Law § 45.09 (b) cannot reasonably be interpreted inconsistently with Mental Hygiene Law § 33.13 (c) (4) since both provisions were enacted jointly in the same legislative proposal. In OPWDD's view, neither section 45.09 (b) nor section 33.13 (c) (4) grants petitioners access greater than what is permitted under federal law. Petitioners agree that Mental Hygiene Law § 45.09 (b) and

---

4. Although Supreme Court agreed with OPWDD on the legal issues, it declined to dismiss the petition/complaint in its entirety, finding that factual issues existed as to whether petitioners had followed the DD Act's procedures with respect to a number of residents.

§ 33.13 (c) (4) should be construed in pari materia, but counter that neither provision ties their access rights to federal law. They read the two statutes—as does the dissent—as allowing them full access to the clinical records they seek, claiming that such access is integral to their mission. Amici organizations support both parties in this controversy.

In matters of statutory interpretation, our primary consideration is to discern and give effect to the Legislature's intention (*see Yatauro v Mangano*, 17 NY3d 420, 426 [2011]). As we have repeatedly stated, the text of a provision "is the clearest indicator of legislative intent and courts should construe unambiguous language to give effect to its plain meaning" (*Matter of DaimlerChrysler Corp. v Spitzer*, 7 NY3d 653, 660 [2006]). Additionally, we should inquire "into the spirit and purpose of the legislation, which requires examination of the statutory context of the provision as well as its legislative history" (*Nostrom v A.W. Chesterton Co.*, 15 NY3d 502, 507 [2010] [internal quotation marks and citation omitted]). Finally, it is well settled that a statute must be construed as a whole and that its various sections must be considered with reference to one another (*see Friedman v Connecticut Gen. Life Ins. Co.*, 9 NY3d 105, 115 [2007]).

At the heart of this appeal is the proper scope of Mental Hygiene Law § 45.09 (b) and § 33.13 (c) (4). In relevant part, section 45.09 (b) provides:

> "Pursuant to the authorization of the commission to administer the protection and advocacy system *as provided for by federal law*, any agency . . . under contract with the commission which provides protection and advocacy services must be granted access . . . to all . . . records . . . pertaining to any such facility upon receipt of a complaint" (emphasis added).

Similarly, section 33.13 (c) (4) permits facilities licensed or operated by OPWDD or the Office of Mental Health to release clinical records to any "agency under contract with the commission which provides protection and advocacy services pursuant to the authorization of the commission to administer the protection and advocacy system *as provided for by federal law*" (emphasis added). The reference to federal law appears in both statutes, but the placement of the reference differs.

As an initial matter, we disagree with the approach taken by the Appellate Division, which applied different interpretations

to the two provisions. Statutes that relate to the same subject are in pari materia and should "be construed together unless a contrary intent is clearly expressed by the Legislature" (*Matter of Plato's Cave Corp. v State Liq. Auth.*, 68 NY2d 791, 793 [1986]). Indeed, in pari materia principles "apply with peculiar force to statutes passed at the same legislative session" (McKinney's Cons Laws of NY, Book 1, Statutes § 221 [a], Comment, at 375). Here, the two statutory amendments relate to the same subject matter, contain identical language and were adopted together. We therefore concur with the parties that the statutes should be read consistently with one another to effect the same legislative intent. We do not find the placement of the "pursuant to" clause at the beginning of the sentence in section 45.09 (b) but at the end of the sentence in section 33.13 (c) (4) a sufficient basis to create divergent meanings, particularly where the two provisions were amended by the very same enactment. The more difficult question before us is ascertaining whether the statutes grant P&A organizations broad access rights uninhibited by the federal criteria, as petitioners assert, or implement the access procedures outlined in the DD Act, as OPWDD proposes.

■ Although the issue is admittedly close, we believe that OPWDD's interpretation of the statutes is more persuasive as a matter of both text and context. In contrast to Mental Hygiene Law § 45.09 (a), which accords the Commission broad access to records as long as they relate to the Commission's "functions, powers and duties," Mental Hygiene Law § 45.09 (b) expressly ties the access rights of P&A organizations to the Commission's administration of the P&A system "as provided for by federal law." Likewise, although Mental Hygiene Law § 33.13 (c) (4) contemplates the release of records to the Commission itself without any limiting language, the amended language that incorporates P&A organizations includes the identical reference to federal law. Hence, contrary to the view expressed by the dissent, the most plausible reading of the two statutes is that P&A organizations are entitled to review records in compliance with federal law. As discussed, the DD Act recognizes the critical advocacy and investigative functions of P&A organizations by authorizing "immediate access" without permission in emergency situations. But the DD Act also strove to balance the purpose and objectives of P&A organizations with the privacy interests of individuals with developmental disabilities by requiring P&A organizations, in situations not involving an

emergency, to notify and obtain the consent of those individuals or, if they are not competent to consent, their legal representatives, unless there is no legal representative or the representative fails to act on their behalf, in which case access will be granted. There is no indication that the New York Legislature intended to deviate from the federal scheme.

The context underlying the enactment of Mental Hygiene Law § 45.09 (b) and amendment to Mental Hygiene Law § 33.13 (c) (4) by the Legislature in 1986 supports this statutory interpretation (see Consedine v Portville Cent. School Dist., 12 NY3d 286, 290 [2009] ["Pertinent also are the history of the times, the circumstances surrounding the statute's passage, and . . . attempted amendments" (internal quotation marks and citation omitted)]). When Congress amended the DD Act in 1984 to require states to grant their P&A systems access to records under specified circumstances in order to maintain eligibility for funding under the federal program, it gave states until 1986 to comply (see Pub L 98-527, § 142, 98 US Stat 2662, 2679-2680 [98th Cong, 2d Sess, Oct. 19, 1984]). In 1985, Governor Mario Cuomo executed an assurance to the federal Department of Health and Human Services that New York would enact amendments to the Mental Hygiene Law to "ensure access by the Protection and Advocacy Program contract agencies consistent with the requirements of Public Law 98-527" (Assurances by the Governor of the State of New York for the Protection of Rights and Advocacy for Persons with Developmental Disabilities, Mar. 12, 1985, Bill Jacket, L 1986, ch 184, at 5). Senator Padavan's memorandum in support of the 1986 legislation affirmed that "[t]he purpose of this bill is to ensure compliance by New York State with . . . (Public Law 98-527) governing the operation of the Protection and Advocacy Program for persons with developmental disabilities which is administered by the Commission" (Mem of Senator Frank Padavan, Bill Jacket, L 1986, ch 184, at 9, 1986 NY Legis Ann, at 126). He further observed that the amendment was necessary to avoid "jeopardizing continued federal funding to the Commission" (id.). Hence, it is clear that the impetus for the 1986 legislation was to ensure New York's compliance with the DD Act in order to maintain eligibility for federal funding. Notably absent from the legislative history is any pronouncement that New York was adopting standards that were broader than required by federal law or

conferring authority on P&A organizations that was cotermi-
nous with that enjoyed by the Commission itself.[5]

In sum, we conclude that the Mental Hygiene Law imple-
ments federal law such that petitioners must follow the
safeguards outlined in the DD Act. If this is not the desire of
the Legislature, it can certainly amend the statutes to provide
otherwise. We now turn to the question of whether petitioners
must notify actively-involved family members of individuals
with disabilities who lack the capacity to consent in order to
comply with the federal directives.

## IV.

OPWDD next argues that the Appellate Division erred in
holding that actively-involved family members cannot be
considered legal representatives for notice and authorization
purposes under the DD Act. It contends that New York law
grants family members of individuals with developmental dis-
abilities significant powers to make personal decisions on their
behalf when they lack the ability to do so for themselves. OP-
WDD further submits that it has in place an appointment and
review system with regard to these family members. Petitioners
respond that the Appellate Division correctly determined that
family members who have not been formally appointed as guard-
ians do not hold the status of legal representatives and,
therefore, P&A organizations need not give them notice or seek
their consent under the DD Act access procedures.

The federal regulations implementing the DD Act define
"[l]egal [g]uardian, conservator and legal representative" as

"an individual appointed and regularly reviewed by
a State court or agency empowered under State law

---

5. Petitioners place heavy reliance on letters written by OPWDD's general
counsel and the Commission's counsel commenting that the 1986 bill expanded
the scope of access contemplated by the DD Act (see Letter of Paul R. Kietz-
man, Office of Mental Retardation and Developmental Disabilities, to Evan A.
Davis, Counsel to the Governor, June 19, 1986, Bill Jacket, L 1986, ch 184, at
21; Letter of Paul F. Stavis, Commission on Quality of Care for the Mentally
Disabled, to Evan A. Davis, Counsel to the Governor, June 18, 1986, Bill
Jacket, L 1986, ch 184, at 12). But postpassage opinions of state agencies are
generally entitled to "little weight" in discerning legislative intent (Majewski
v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 587 n 2 [1998]). Even
considering the views expressed in such correspondence, the structure of the
statutes and the expressed legislative objective prior to passage convince us
that, although counsel may have wanted to substitute other statutory
language, the amendments as adopted were intended to incorporate the federal
access standards.

to appoint and review such officers and having authority to make all decisions on behalf of individuals with developmental disabilities. It does not include persons acting only as a representative payee, person acting only to handle financial payments, attorneys or other persons acting on behalf of an individual with developmental disabilities only in individual legal matters, or officials responsible for the provision of treatment or habilitation services to an individual with developmental disabilities or their designees" (45 CFR 1386.19).

The regulation prescribes two requirements for individuals to qualify as legal representatives: (1) they must have sufficient decision-making authority and (2) they must be appointed and regularly reviewed by a court or state agency. Moreover, the regulation looks to state law for both elements. We address each in turn.

## A.

"Actively involved" or "qualified" family members enjoy a recognized status and are able to make a number of critical decisions on behalf of individuals with developmental disabilities under New York law. For example, actively-involved family members may give informed consent for major medical procedures on behalf of individuals residing in OPWDD facilities who lack the "capacity to understand appropriate disclosures regarding proposed professional medical treatment" (14 NYCRR 633.11 [a] [1] [iii] [b]). Similarly, they may approve service plans involving an "untoward risk to an individual's protection or rights" (14 NYCRR 681.13) and object to OPWDD-related services on behalf of such individuals (see 14 NYCRR 633.12). Most notably, New York law now permits actively-involved family members to make end-of-life decisions on behalf of developmentally disabled individuals without capacity, including the decision to "withhold or withdraw life-sustaining treatment" (SCPA 1750-b [1] [a]; see also 14 NYCRR 633.10 [a] [7] [iv]; Matter of M.B., 6 NY3d 437, 441 [2006] [describing the process applicable to the cessation of life-sustaining medical treatment for individuals "who never had capacity to make such a decision"]).

New York law further affords family members of individuals with developmental disabilities various notification and document access rights. Under OPWDD's regulations, family

members are entitled to notice of reports of abuse, neglect and injuries (*see* 14 NYCRR 624.6), and are to receive investigative reports pertaining to such matters (*see* 14 NYCRR 624.8). The Mental Hygiene Law also grants them the ability both to access and authorize the release of their disabled relative's clinical records (*see* Mental Hygiene Law § 33.13 [c] [7]; § 33.16).

██ These provisions, taken together, amply demonstrate that actively-involved family members enjoy sufficient decision-making authority such that they may be classified as legal representatives within the meaning of 45 CFR 1386.19. We reject petitioners' assertion that a legal representative must have the ability to make every possible decision. Indeed, such an interpretation would render the entire second sentence of the regulation unnecessary, as it is plain that "representative payee[s]," persons that "handle financial payments" and attorneys who provide representation on "individual legal matters" do not have unqualified decision-making powers. The negative examples cited in the regulation support our conclusion that actively-involved family members qualify under New York law as each of the stated examples involves persons who have only discrete authorization with regard to financial or legal matters. In contrast, actively-involved family members possess the authority to make many of the most important personal decisions affecting the health and well-being of their developmentally disabled relative. As NYSARC, Inc. observes in its amicus brief, it would be peculiar for a parent or other family member who enjoys the ability to withhold or withdraw life-sustaining treatment to lack the much less intrusive right to be consulted before a third party reviews a resident's personal records.

Under the federal regulation, however, it is not enough that the individual possesses sufficient decision-making authority. There must also be in place an appointment and review mechanism in connection with these legal representatives.

## B.

According to OPWDD, the staff at its facilities considers the relationship between a developmentally disabled individual and each actively-involved family member to make a determination as to which relative is best suited to make decisions on behalf of the individual. Under OPWDD's regulations, an "[a]ctively involved adult family member" is defined to mean "[s]omeone 18 years of age or older who is related to a person in a facility

and who has demonstrated, in the opinion of the interdisciplinary team, significant and ongoing involvement in the individual's life, as well as sufficient knowledge of the individual's needs" (14 NYCRR 681.99 [k]; *see also* 14 NYCRR 633.99 [ax]). OPWDD represents that, through this process, a family member is "designated" as the legal representative, and that designation is noted in the facility's records. OPWDD further asserts that the legal representative designation is reviewed and changed as circumstances require.

Petitioners submit that OPWDD's system is inadequate as a matter of law because there is no statute in place governing these procedures. But we note that OPWDD's regulatory authority may suffice under 45 CFR 1386.19 (*see Matter of Allstate Ins. Co. v Rivera*, 12 NY3d 602, 608 [2009] [explaining that agency regulations have "the force of law" (internal quotation marks and citation omitted)]). Nevertheless, given the pre-answer procedural posture of this case, we agree with petitioners that a remittal for further proceedings is necessary to examine the nature and adequacy of OPWDD's process for selecting and reviewing actively-involved family members.

## V.

On their cross appeal, petitioners contend that the courts below erred in striking certain paragraphs of the petition/complaint pursuant to CPLR 3024 (b), which permits a court "to strike any scandalous or prejudicial matter unnecessarily inserted in a pleading." We perceive no abuse of discretion as a matter of law on this issue.

\* \* \*

We stress that our decision does not preclude P&A organizations like petitioners from gaining access to the clinical records of individuals with developmental disabilities. Undoubtedly, petitioners perform critically important services aimed at safeguarding and improving the conditions under which these vulnerable citizens live. But based on the language and structure of the statutes at issue, we hold that New York law parallels federal law, which balances the privacy rights of such individuals with the need of P&A organizations to examine records to further their advocacy mission. Under this regime, petitioners are entitled to immediate access of records without consent in an emergency situation—which they acknowledge is not implicated by the facts of this case. In other scenarios, they

may obtain the consent of the individual or his or her legal representative; they are entitled to access where there is no legal representative and the individual lacks capacity to consent; and they are entitled to access where the legal representative takes no action in the face of a complaint or probable cause. Given the role played by actively-involved family members of individuals with developmental disabilities under New York law, we further conclude that it is possible for them to be classified as legal representatives for compliance with federal requirements, but remit the issues relating to OPWDD's appointment and review process for further development.

Accordingly, the order of the Appellate Division should be modified, without costs, and the case remitted to Supreme Court for further proceedings in accordance with this opinion and, as so modified, affirmed. The certified question should be answered in the affirmative.

CIPARICK, J. (dissenting). Because I believe that Mental Hygiene Law § 45.09 (b) and § 33.13 (c) (4) give the protection and advocacy agencies (P&A agencies) equal access to the clinical records of residents in facilities operated under the auspices of the Office for People with Developmental Disabilities (OPWDD) and records and data of those same facilities as are available to the Commission on Quality of Care and Advocacy for Persons with Disabilities (the Commission), I respectfully dissent. I further believe that OPWDD's definition of an "actively involved family member" does not meet the federal requirements for a "legal guardian, conservator and legal representative," and that access to the clinical records of residents should not be conditioned upon the consent of such family members.

It is uncontroverted that, pursuant to Mental Hygiene Law § 45.09 (a) and § 33.13 (c) (4), the Commission has broad, unrestricted access to the clinical records of residents of OPWDD facilities as well as to the facilities' own records and data. In order to be eligible for federal funding under the Developmental Disabilities Assistance and Bill of Rights Act pursuant to 42 USC § 15043 and 45 CFR 1386.21, minimal access to these records must be given to P&A agencies. However, the State may also provide P&A agencies, charged with the duty of providing protection and advocacy services pursuant to contracts with the Commission, greater authority than exists under the federal statutes (see 45 CFR 1386.21 [f]). In determining what degree of access the P&A agencies shall enjoy, we must interpret both Mental Hygiene Law provisions.

I agree with the majority's conclusion that the phrase "as provided for by federal law" as used in both section 45.09 (b) and section 33.13 (c) (4) should be read harmoniously and interpreted in the same manner. However, I disagree with the majority's conclusion that "as a matter of both text and context" the phrase mandates that the access to records accorded to the P&A agencies is limited to that which is delineated in the federal scheme and is consequently less broad than the access granted to the Commission (majority op at 121-122), I believe that both a plain reading of the statutes (*see Matter of Orens v Novello*, 99 NY2d 180, 185 [2002]) and the context in which the statutes were enacted demonstrate that the intent of the Legislature was to provide the P&A agencies with access as broad as that provided to the Commission in order to enable them to carry out their protection and advocacy functions.

Turning to the text of the statutes, Mental Hygiene Law § 45.09 (b) provides:

> "Pursuant to the authorization of the commission to administer the protection and advocacy system *as provided for by federal law*, any agency or person within or under contract with the commission which provides protection and advocacy services must be granted access at any and all times to any facility, or part thereof, serving a person with a disability operated or licensed by any office or agency of the state, and to all books, records, and data pertaining to any such facility upon receipt of a complaint by or on behalf of a person with a disability. Information, books, records or data which are confidential as provided by law shall be kept confidential by the person or agency within the protection and advocacy system and any limitations on the release thereof imposed by law upon the party furnishing the information, books, records or data shall apply to the person or agency within the protection and advocacy system" (emphasis added).

While the majority would have the phrase "as provided for by federal law" apply to the entire section, it is noteworthy that the phrase "[p]ursuant to the authorization of the commission to administer the protection and advocacy system as provided for by federal law" is set off from the rest of the paragraph by a comma. "Common marks of punctuation are used to clarify the writer's intended meaning and thus form a valuable aid in

determining legislative intent" (*A.J. Temple Marble & Tile v Union Carbide Marble Care*, 87 NY2d 574, 581 [1996]). Therefore, a natural reading of the statute would indicate that the qualifier "as provided for by federal law" refers to the federal authorization of the commission to administer the protection and advocacy system and is not a limitation on the scope of the authority of the P&A agencies to request records. It identifies P&A agencies as those agencies under contract with the Commission providing services to the developmentally disabled and having access to facility records as opposed to contracting agencies that provide other services.

Similarly, Mental Hygiene Law § 33.13 (c) provides:

> "Such information about patients or clients reported to the offices, including the identification of patients or clients, clinical records or clinical information tending to identify patients or clients, and records and information concerning persons under consideration for proceedings pursuant to article ten of this chapter, at office facilities shall not be a public record and shall not be released by the offices or its facilities to any person or agency outside of the offices except as follows: . . .

> "4. to the commission on quality of care for the mentally disabled and any person or agency under contract with the commission which provides protection and advocacy services pursuant to the authorization of the commission to administer the protection and advocacy system *as provided for by federal law*" (emphasis added).

The placement of "as provided for by federal law" at the end of section 33.13 (c) (4) indicates that it was only intended to modify the last clause (*see People v Shulman*, 6 NY3d 1, 34 [2005] ["(r)elative or qualifying words of clauses ordinarily are to be applied to the words or phrases immediately preceding, and are not to be construed as extending to others more remote, unless the intent of the statute clearly indicates otherwise" (internal quotation marks and ellipsis omitted)]). Here the immediate antecedent phrase is "the authorization of the commission to administer the protection and advocacy system." Again, as in section 45.09, the most natural reading of this provision is that the reference to federal law concerns the federal authorization of the Commission to administer the protection and advocacy system and to give access to the P&A agencies to records—in this case, clinical records of residents.

Although the majority is correct in pointing out that the primary impetus for passing the two provisions was to ensure that New York State remained in compliance with the federal requirements necessary to receive federal funding for the program (*see* majority op at 122-123), there is no indication in the legislative history that the Legislature intended to restrict the P&A agencies' access to the records to comply with the federal requirements. In fact, the Legislature was concerned about issues of access to the records. Senator Padavan noted in his memorandum in support of the 1986 legislation that "during the past year, the Commission had difficulty accessing records involving an individual living in a facility for developmentally disabled individuals certified by an agency outside of the Department of Mental Hygiene" (Mem of Senator Frank Padavan, Bill Jacket, L 1986, ch 184, at 9, 1986 NY Legis Ann, at 126). Furthermore both counsel for the Commission and counsel for OPWDD (formerly the New York State Office of Mental Retardation and Developmental Disabilities) interpreted the statute as providing the broad access to records that is enjoyed by the Commission. Counsel for the Commission noted that "[t]his bill accomplished two essential goals. First, section one of the bill will enable the agencies under contract with the Commission as part of this protection and advocacy program, to obtain access to mental hygiene residential facilities and client records allowed to the Commission itself under current law" (Letter of Paul F. Stavis, Commission on Quality of Care for the Mentally Disabled, to Evan A. Davis, Counsel to the Governor, June 18, 1986, Bill Jacket, L 1986, ch 184, at 12). Counsel for OPWDD was concerned that

> "[a]s currently proposed, this amendment to § 45.09 would permit any person or agency within the protection and advocacy system to have access to all of the facility's information, regardless of whether or not that person is investigating the complaint . . .
>
> "The amendment enlarges the scope of access required by the Act" (Letter of Paul R. Kietzman, Office of Mental Retardation and Developmental Disabilities, to Evan A. Davis, Counsel to the Governor, June 19, 1986, Bill Jacket, L 1986, ch 184, at 21).

Thus it seems that the concerned agencies understood that the

Legislature gave to the P&A agencies the same access as given to the Commission. True, these letters were not before the Legislature prior to the passage of the bill, however, they do indicate that the interpretation of the statutes as allowing the P&A agencies access to the records equivalent to that of the Commission is a rational one and in keeping with the purpose of the creation of the protection and advocacy programs.

Further, being on notice of this broad reading of the statutes, the Legislature did not see fit to amend them to indicate that the P&A agencies' access is limited to that codified in the federal statute. Accordingly, it may be inferred that the interpretation proposed by petitioners here is in line with the intent of the Legislature, which was free to grant more access to the records than that required by the federal statutes, and in my opinion, sought to give equal access to the Commission and its P&A agencies.

Having determined that both statutes, enacted as part of the same legislation, must be interpreted harmoniously to allow the P&A agencies unrestricted access to both the facility records and data and the clinical records of facility residents equal to that enjoyed by the Commission itself, I turn to the further issue wherein respondents seek to limit access to the clinical records by requiring permission from an "actively involved family member."

I disagree with the majority's conclusion that "actively involved" or "qualified" family members may qualify as a "legal guardian, conservator and legal representative" as defined by the Developmental Disabilities Assistance and Bill of Rights Act (see majority op 125) and agree with the Appellate Division's finding that they do not qualify as legal guardians.

45 CFR 1386.19 provides: "Legal Guardian, conservator and legal representative all mean an individual appointed and regularly reviewed by a State court or agency empowered under State law to appoint and review such officers and having authority to make all decisions on behalf of individuals with developmental disabilities." It is uncontroverted that New York State has no formal appointing or reviewing process for designating family members as "actively involved." The OPWDD argues that it has sufficient procedures in place to designate a family member as a legal guardian within the ambit of the federal requirements. The OPWDD's regulations define an "[a]ctively involved adult family member" as "[s]omeone 18 years of age or

older who is related to a person in a facility and who has demonstrated, in the opinion of the interdisciplinary team, significant and ongoing involvement in the individual's life, as well as sufficient knowledge of the individual's needs" (14 NYCRR 681.99 [k]). While it may be true, as the majority notes, that the OPWDD's regulatory authority may have "the force of law" (majority op at 126), this informal process as defined in the OPWDD's regulations does not adequately regulate the appointment or the reviewing process as opposed to a court appointed guardian pursuant to the provisions of Mental Hygiene Law article 81 or Surrogate's Court Procedure Act article 17-A, wherein much court oversight exists. Therefore, as a matter of law, the OPWDD's regulation is inadequate to fulfill the requirements of 45 CFR 1386.19.

Accordingly, I would vote to modify the Appellate Division order as indicated above and grant the petition to the extent of ordering respondents to provide petitioners the clinical records as well as the system data facility records sought.

Judges READ, PIGOTT and JONES concur with Judge GRAFFEO; Judge CIPARICK dissents in a separate opinion in which Chief Judge LIPPMAN and Judge SMITH concur.

Order modified, etc.