Matter of NYC Org. of Pub. Serv. Retirees, Inc. v Campion (2024 NY Slip Op 06291)

Matter of NYC Org. of Pub. Serv. Retirees, Inc. v Campion

2024 NY Slip Op 06291

Decided on December 17, 2024

Court of Appeals

Wilson, Ch. J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on December 17, 2024

No. 93 

[*1]In the Matter of NYC Organization of Public Service Retirees, Inc., et al., Respondents,
v
Renee Campion, et al., Appellants.

Richard Dearing, for appellants.
Jacob S. Gardener, for respondents.
New York City Municipal Labor Committee, Donald Berwick, New York City Correction Captains Association et al., Physicians for a National Health Program-New York Metro,
The Public Sector HealthCare Roundtable, amici curiae.

WILSON, Chief Judge:

At issue on this appeal are the portions of Administrative Code of the City of New York § 12-126 requiring New York City ("City") to pay, for active employees, retirees and their dependents, "the entire cost of health insurance coverage," defined as "[a] program of hospital-surgical-medical benefits," in an amount "not to exceed one hundred percent of the full cost of H.I.P.-H.M.O. on a category basis." The statute requires that the City's program includes "hospital[,] surgical [and] medical benefits." The statute also requires the City to pay the full cost of the program, so long as that cost does not exceed the comparator in the statute. The question in this case is what section 12-126 requires the City to do when it offers more than one health insurance plan to employees and retirees. Petitioners argue that section 12-126 requires the City to pay, up to the statutory cap, for any plan it offers. The City contends that its section 12-126 obligation is satisfied if it pays up to the cap for one health insurance plan providing hospital, surgical and medical benefits. It argues that it may offer additional plans but has no statutory obligation to pay any portion of their cost, and explains that when it has paid for additional plans in the past, it has done so because it agreed to in collective bargaining, not because it was statutorily required to do so. The parties also disagree as to which health insurance plan sets the statutory cap for Medicare-eligible retirees.
We hold that section 12-126 requires the City to pay up to the statutory cap for any plan it offers to employees and retirees. We do not reach the question of how the statutory cap should be determined because the City has not demonstrated that the question was preserved, and its answer depends on "further evidence" not presented on the record below.
I
New York City provides health insurance coverage to active employees and retirees. Many of the City's retirees are 65 and over and therefore eligible for Medicare. Because Medicare covers a large share of an individual's health insurance costs, the health insurance plans available to Medicare-eligible individuals require enrollment in Medicare. The plans offered to such persons may be either Medigap or Medicare Advantage plans. Medigap plans supplement regular Medicare by insuring costs that Medicare does not cover. Under a Medigap plan, the retiree is covered by Medicare and by a supplemental private insurance plan. Medicare Advantage plans, in contrast, replace the federal government with a private insurer as the primary provider of health insurance. The insurance company receives subsidies from the federal government to pay for the costs of healthcare.
This case arises out of the City's plan to discontinue payment for any portion of the premiums for Senior Care, a Medigap plan which petitioners are enrolled in and wish to keep. Historically, the options offered to Medicare-eligible City retirees included two plans: the HIP VIP Premier (HMO) plan ("HIP VIP") and Senior Care. Until 2021, the City paid the full cost of premiums for both. If a retiree selected a plan that was more expensive than Senior Care, the City would pay the premium up to the cost of Senior Care, and the retiree would be responsible for the remaining cost. As of 2021, the majority of City retirees (approximately 200,000 out of 250,000) were enrolled in Senior Care.
In July 2021, the City and the Municipal Labor Committee (MLC)—an association of unions that bargains, on behalf of its constituent unions, with the City on Citywide health benefits—agreed to change the health insurance benefits offered to Medicare-eligible retirees. Under the plan, retirees enrolled in Senior Care would be automatically enrolled in a new NYC Medicare Advantage Plus Plan (MAPP) unless they opted out by October 31, 2021. The City would continue to offer Senior Care as an option for Medicare-eligible retirees but would no longer cover any portion of its premiums. The City argues that the changes would reduce its healthcare costs.
II
Petitioners are Medicare-eligible retirees and a new organization created to represent them. In September 2021, they brought a CPLR Article 78 proceeding seeking to block the City's transition to MAPP. Petitioners moved for a preliminary injunction. The City opposed the motion and cross-moved to dismiss the petition. On October 21, 2021, Supreme Court preliminarily enjoined the City from enforcing the October 31, 2021, opt-out date. On December 14, 2021, Supreme Court extended the preliminary injunction to April 1, 2022.
On January 31, 2022, petitioners moved for "summary judgment."[FN1] That motion responded to the arguments raised by the City in its cross-motion to dismiss. The next day, the City sent a letter to the court asserting its "strong desire for a determinative ruling as soon as possible in an effort to proceed with the Medicare Advantage Plus Plan as scheduled." On February 4, 2022, the City responded to petitioners' motion. On February 28, 2022, the court held a hearing on the merits of the petition.
By letter dated March 2, 2022, the City raised a new argument, asserting that the City is not statutorily required to pay Senior Care's premiums because the statutory cap is lower than the cost of Senior Care. The City's letter asserted that the statutory cap for Medicare-eligible retirees "would not be the one for the active employee HIP-HMO plan, as Petitioners argue, but the retiree HIP-HMO plan called HIP-VIP (HMO)." Petitioners responded by letter the next day, objecting to the City's argument on timeliness grounds and on the merits.
That same day, Supreme Court denied the City's motion to dismiss and granted the petition in part (see 2022 NY Slip Op 30657[U] [Sup Ct, NY County 2022]). The court permanently enjoined the City "from passing along any costs of the New York City retirees' current plan to the retiree or to any of their dependents, except where such plan rises above the H.I.P.-H.M.O. threshold" (id. at *4). With respect to the statutory cap, the court wrote that it was "the Court's understanding that the threshold is not crossed by the cost of [Senior Care]," though the court's opinion did [*2]not identify how the relevant cap was determined, what dollar amount it represented, or what the cost of Senior Care was (id. at *3).
The Appellate Division affirmed the judgment insofar as appealed from by the City. The Court agreed that Administrative Code § 12-126 (b) (1) requires the City to pay the full cost, up to the statutory cap, of any health insurance plan it offers to retirees (210 AD3d 559, 560 [1st Dept 2022]). The Appellate Division held that the question of which plan sets the "statutory cap" was "improperly raised for the first time on appeal" and involved factual issues such as the interpretation of "on a category basis" and the cost of HIP VIP (id.).
We granted respondents leave to appeal (39 NY3d 915 [2023]), and now hold that the Appellate Division correctly determined the City must pay the full cost, up to the statutory cap, of any plan it offers. We therefore affirm.
III
Administrative Code § 12-126 (b) (1) constrains the City's collective bargaining over health insurance (cf. Matter of City of Watertown v State of N.Y. Pub. Empl. Relations Bd., 95 NY2d 73, 79 [2000] ["(B)argaining is mandatory even for a subject 'treated by statute' unless the statute 'clearly preempt[s] the entire subject matter' or the demand to bargain 'diminish[es] or merely restate[s] the statutory benefits'"]). Section 12-126 (b) (1) provides: "The city will pay the entire cost of health insurance coverage for city employees, city retirees, and their dependents, not to exceed one hundred percent of the full cost of H.I.P.-H.M.O. on a category basis." The term "health insurance coverage" is defined in section 12-126 (a) (iv) as "[a] program of hospital-surgical-medical benefits to be provided by health and hospitalization insurance contracts entered into between the city and companies providing such health and hospitalization insurance." The question in this case is whether the City is statutorily required to pay up to the statutory cap for every plan it offers retirees, or whether section 12-126 is satisfied if the City offers one subsidized plan for hospital-surgical-medical benefits and others for which it does not pay at all.
"In matters of statutory interpretation, our primary consideration is to discern and give effect to the Legislature's intention" (Matter of Albany Law School v New York State Off. of Mental Retardation & Dev. Disabilities, 19 NY3d 106, 120 [2012]). Where the text is ambiguous, "we inquire into the spirit and purpose of the legislation by examining the statutory context of the provision as well as its legislative history" (Simmons v Trans Express Inc., 37 NY3d 107, 113 [2021] [internal quotation marks omitted]).
Here, the statutory text is ambiguous. In favor of petitioners' interpretation, "a program of" medical benefits is different from "a plan of" medical benefits. That reading aligns with the City's longstanding practice of offering multiple health insurance plans as part of a program that included options. Additionally, the City refers to the array of health benefits it offers as the "New York City Health Benefits Program," further supporting the idea that "program" refers to all plans offered by the City. Moreover, paragraph (iv) specifies that this program of medical benefits is to be provided by "insurance contracts" between the City and health insurance "companies." The use of the plural for these terms could be read to suggest that "program" would include multiple plans offered by several companies.
In favor of the City's interpretation, the term "program" could also be read refer to the collection of benefits—i.e., hospital-surgical-medical benefits—under a single health insurance plan; not to a variety of insurance plans offered by the City. The use of the plural "contracts" might merely allow the City to obtain one type of benefit (e.g., medical) from one provider and another type of benefit (e.g., surgical) from a different provider. The City's interpretation is somewhat supported by subdivision (b) (2) (iii), which states that when an employee "dies and is enrolled in a health insurance plan, the surviving spouse shall be afforded the right to such health insurance coverage" (Administrative Code § 12-126 [b] [2] [iii]). Reading "health insurance coverage" in that context to include a program of whatever the City offered to all employees appears inconsistent with the use of "such," which evidences an intent to limit the surviving spouse to the plan the decedent had. Similarly, the statutory scheme refers to "health insurance coverage" predicated on Medicare enrollment (see id. § 12-126 [b] [1], [2] [i]-[iv]), which would not cohere for similar reasons if the Court adopted petitioners' interpretation of "program."
Given the lack of clarity in the statutory language, we turn to the legislative history. That history better supports the view that when enacting section 12-126, the City Council and the Mayor intended to require the City to pay, up to the cap, for any plans it offered as part of its health insurance program. That reading is consistent with the Council's contemporaneous use of "program" to refer to the City's "program" of health insurance plans. It is also [*3]consistent with the many references to employee and retiree choice in the state-law amendments and City Council resolutions that preceded section 12-126.
The legislative history of section 12-126 began in early 1965, when the City entered into a collective bargaining agreement with the Patrolmen's Benevolent Association, the Uniformed Firemen's Association, the Correction Officers' Benevolent Association and the Transit Policemen's Benevolent Association. The City agreed to offer employees a choice among three private health insurance plans and to pay the full cost of each "not to exceed 100 per cent of the full cost of HIP-Blue Cross (21-day plan) on a category basis." On February 11, 1965, the Board of Estimate (Board) adopted a resolution authorizing the City to enter into contracts with the relevant private insurers (2 Journal of Proceedings of the Board of Estimate of City of New York, from Jan. 29, 1965, to Mar. 11, 1965, at 1123 [Cal. No. 155, Feb. 11, 1965]). Resolution 155's language capping the City's required expenditures at the cost of HIP-Blue Cross (21-day plan) was later incorporated into section 12-126.
But there was one problem: Resolution 155 was unlawful. State law forbade the City from providing health care insurance through contracts with private insurers, and also forbade the City from paying more than 50% of the cost of employee and retiree health insurance. Unlike other municipalities and the State itself, the City could enter into health insurance contracts only with non-profit insurance carriers and could pay only up to 50% of employee/retiree costs. Seeking to make its agreement legal, the City passed a home rule request asking the state legislature to amend the General Municipal Law and General City Law. In July 1965, the State granted the City the authority to (1) contract with private insurance carriers to provide employee and retiree health insurance, and (2) pay up to the full cost of that insurance (see L 1965, ch 782; see General City Law § 20 [29], [29-a]). The amendments were enacted in July 1965 but applied retroactively to authorize contracts entered into beginning on January 1, 1965 (see L 1965, ch 782, § 5).
The Mayor's office described the state-level amendments as a way to broaden the health insurance choices available to New York City employees and retirees. In New York City's memorandum in support of the 1965 amendments, Assistant to the Mayor Paul E. Bragdon wrote that the bill "would be of great benefit to all persons employed by cities and other municipalities because it expands the range of available health insurance coverage for such employees and their families" (Mem of City of NY in Support, L. 1965, ch. 782, at 3 [emphasis added]). In another memorandum, he explained: "The choice of coverage which could be offered under these amended statutes would permit each employee to obtain the form of insurance most advantageous to himself in the light of his personal circumstances" (Revised Mem of City of NY in Support, Bill Jacket, L. 1965, ch. 782, at 18). The Mayor's office asserted that the "primary thrust" of the bill was to allow the city to "institute a choice of health insurance plan" like that previously negotiated for certain City employees (id. at 17).
Resolution 155 did, in fact, provide retirees and active employees with a choice of health insurance plans. The Resolution itself explained that the City intended to give certain employees "a choice among several hospital-surgical-medical insurance plans." In December 1965, the Board of Estimate extended Resolution 155's choice of plans to all City employees and retirees through Resolution 292, explaining: "It is the desire and intent of the City to grant to all its employees . . . a choice of health plans consisting of H.I.P.-Blue Cross, G.H.I.-Blue Cross and Blue Cross-Blue Shield-Major Medical." (Cumulative Annual Index to the Journal of Proceedings of Board of Estimate of City of New York, from Jan. 1 to Dec. 31, 1965, at 8557 [Cal. No. 292, Dec. 16, 1965]).
In 1967, the City Council codified the Board's resolutions. The Council's first attempt to do so would have required the City to "provide and pay for the entire cost of any basic health insurance plan providing for medical and hospitalization coverage" (Council of City of NY Intro No. 430-1967 [emphasis added]). The proposal did not define the phrase "basic health insurance plan," nor did it incorporate any cap on the City's financial obligations.
On September 12, 1967, the Mayor vetoed the proposal, which he said would subject the City to unpredictable financial burdens. He explained that "[t]he phrase 'basic health insurance plan' is nowhere defined, except to say that it does include, but is not limited to, Title XVIII benefits. Thus, the City would be bound to an open-ended obligation to pay for coverages which it cannot now possibly anticipate" (2 Proceedings of the Council of the City of New York from July to December 19, 1967, at 75 [M-389, Sept. 12, 1967]). In response, the City Council enacted Local Law 120 (1967) of City of New York, which added the definition of "health insurance coverage" found in Administrative Code § 12-126 (a) (iv): "[a] program of hospital-surgical-medical benefits to be provided by health and hospitalization insurance contracts entered into between the city and companies providing such health and hospitalization insurance " (see Council of City of NY Intro No. 474-1967). Local Law 120 also incorporated the [*4]"statutory cap" from the Board's resolutions, requiring the City to pay only up to "the full cost of HIP-Blue Cross (21-day plan) on a category basis."[FN2]
In context, Local Law 120's definition of "health insurance coverage" sought to control the City's potential expenditures by limiting retirees to the program of plans offered by the City. Whereas the previous iteration of the law might have required the City to pay the cost of any insurance plan a retiree selected, Local Law 120 requires the City to pay only for the "program" of insurance plans offered by the City. Equally important, Local Law 120 limited the City's exposure by capping its legal obligation at the "full cost of HIP-Blue Cross (21-day plan) on a category basis," thus providing a financial exposure limit that addressed the Mayor's principal concern.
Reading the definition of "health insurance coverage" to extend to the full array of health insurance plans offered by the City also aligns with contemporaneous use of the word "program." Resolution 292, for example, referred to the City's "health insurance program," which at the time consisted of three plans (Cumulative Annual Index to the Journal of Proceedings of Board of Estimate of City of New York, from Jan. 1 to Dec. 31, 1965, at 8561 [Cal. No. 292, Dec. 16, 1965]). Specifically, the Resolution directed the Director of Personnel "to study the effect of the Medicare program on the City's health insurance program and to report to the Board of Estimate . . . his recommendations concerning any adjustments or revisions in the City's program" (id.). Moreover, a 1965 report on behalf of the Mayor requesting funding for the "implementation of choice of health insurance plans" authorized in the Board's resolutions described the array of plans offered by the City as a "program":
"In order to provide a choice of health insurance plans for employees not previously eligible for this program as of January 1, 1966, and to cover the cost of providing such choice to employees . . . it is necessary to provide funds for the implementation of said program" (10 Journal of Proceedings of the Board of Estimate of the City of New York from Nov. 19, 1965, to Dec. 31, 1965, at 8249 [Cal. No. 5, Dec. 16, 1965]).
We are asked to resolve what requirements section 12-126 (b) (1) imposes upon the City. We conclude that the City must pay—up to the statutory cap—for each health insurance plan that it offers employees and retirees.
IV
We are also asked to resolve whether Medicare eligibility is a "category" under section 12-126's "statutory cap." The City has not demonstrated that this question is preserved for our review.
The City first raised the argument that HIP VIP sets the statutory cap for Medicare-eligible retirees in a post-hearing letter to Supreme Court, weeks after it had requested a final determination of the petition "as soon as possible," and on the literal eve of Supreme Court's decision. The record does not establish that Supreme Court was even aware of the parties' submissions when it issued its final determination. The court's decision does not expressly reference the letter or address petitioners' objection to its belated submission. The decision is most clearly read to hold that, on the motion before it, the court did not need to determine what the statutory cap was, because of the court's "understanding" that the cost of Senior Care was below the statutory cap however it was determined—a conclusion Supreme Court could have drawn based on the undisputed facts at the time of the hearing. We thus cannot conclude that Supreme Court considered the issue raised in the letters as timely or in any way ruled on the issue in its decision.
The order of the Appellate Division should be affirmed, with costs.
Order affirmed, with costs. Opinion by Chief Judge Wilson. Judges Rivera, Garcia, Singas, Cannataro, Troutman and Halligan concur.
Decided December 17, 2024

Footnotes

Footnote 1: Although Supreme Court held that the summary judgment motion was not "legally permissible in this proceeding," the court "reviewed the papers submitted for [the motion] as being incorporated to the 2 motion sequences that were proper." 

Footnote 2: In 1984, the City Council amended section 12-126, replacing "HIP-Blue Cross (21-day plan)" with "H.I.P.-H.M.O" (Local Law No. 28 [1984] of City of NY). A note in the legislative history explains: "The H.I.P./Blue Cross (21 day plan) no longer is used; the correct designation for this health insurance coverage is H.I.P./H.M.O." (Mem of Martha K. Hirst, Assistant Legislative Representative to the City Council, Local Law Bill Jacket, Local Law No. 28 [1984] of City of NY).