Matter of Sapphire W. (Kenneth L.) (2025 NY Slip Op 00662)

Matter of Sapphire W. (Kenneth L.)

2025 NY Slip Op 00662

Decided on February 5, 2025

Appellate Division, Second Department

Ventura, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on February 5, 2025
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

CHERYL E. CHAMBERS, J.P.
VALERIE BRATHWAITE NELSON
DEBORAH A. DOWLING
LOURDES M. VENTURA, JJ.

2023-10606
 (Docket No. N-17879-23)

[*1]In the Matter of Sapphire W. (Anonymous). Administration for Children's Services, petitioner- respondent; Kenneth L. (Anonymous), respondent; Sharneka W. (Anonymous), nonparty-appellant.

APPEAL by the nonrespondent mother, in a proceeding pursuant to Family Court Act article 10, from an order of the Family Court (Robert D. Hettleman, J.), dated August 31, 2023, and entered in Kings County. The order, insofar as appealed from, placed the nonrespondent mother under the supervision of the Administration for Children's Services and the Family Court, and directed her to cooperate with the Administration for Children's Services in certain respects.

Family Justice Law Center, New York, NY (David Shalleck-Klein and Orrick, Herrington & Sutcliffe LLP [Naomi J. Scotten], of counsel), for nonparty-appellant.
Muriel Goode-Trufant, Corporation Counsel, New York, NY (Rebecca L. Visgaitis, Josh Liebman, and Ingrid Gustafson of counsel), for petitioner-respondent.
Twyla Carter, New York, NY (Dawne A. Mitchell and Zoe Allen of counsel), attorney for the child.
Columbia Law School-Family Defense Clinic, New York, NY (Josh Gupta-Kagan and Neighborhood Defender Service of Harlem [Michael Weinstein] pro se of counsel), amicus curiae pro se and for amici curiae Neighborhood Defender Service of Harlem, Center for Family Representation, Bronx Defenders, Children's Rights, and National Association of Counsel for Children.
Saul Ewing LLP, New York, NY (Michael S. O'Reilly and John A. Basinger of counsel), for amicus curiae Americans for Prosperity Foundation.
Lara Flath, New York, NY (Kartik Naram of counsel), for amici curiae Sanctuary for Families, Day One, Empire Justice Center, Her Justice, Incendii Law, PLLC, Lawyers Committee Against Domestic Violence, Legal Momentum, New York Legal Assistance Group, and New York State Coalition Against Domestic Violence.
New York Civil Liberties Union Foundation, New York, NY (Jessica Perry, Jenna Lauter, Gabriella Larios, Molly K. Biklen, and American Civil Liberties Union Foundation [Linda S. Morris, pro hac vice, Aditi Fruitwala, pro hac vice, and Anjana Samant] of counsel), for amici curiae New York Civil Liberties Union, American Civil Liberties Union Women's Rights Project, and National Center for Youth Law.

VENTURA, J.

OPINION & ORDER
This appeal presents this Court with the opportunity to decide an issue of first impression in New York involving the rights of nonrespondent parents in child neglect proceedings, to wit: whether the Family Court may place a nonrespondent custodial parent under the supervision of the Administration for Children's Services (hereinafter ACS) and the court, and direct the parent to cooperate with ACS in various ways, in circumstances where the respondent parent resides elsewhere and the child has not been removed from the nonrespondent parent's home. Considering, inter alia, the well-established "interest of a parent in the companionship, care, custody, and management of his or her children" (Stanley v Illinois, 405 US 645, 651) and the lack of any statutory authority permitting the challenged directives, we answer this question in the negative. Therefore, we conclude that, in this case, the Family Court improperly placed the mother under the supervision of ACS and the court, and directed her to cooperate with ACS in certain respects.
I. Background of the Proceeding
The father and the mother are the parents of a child born in 2022. In August 2023, ACS commenced this proceeding pursuant to Family Court Act article 10 against the father, alleging that he neglected the child by committing acts of domestic violence against the mother at her home in the presence of the child. In the petition, ACS asserted that the mother had previously contacted the police concerning domestic violence perpetrated against her by the father, and that the police returned to her home at a later date to conduct a wellness check. After the police left, the father, who was present in the home while the police were there, allegedly became physically and verbally aggressive with the mother, including by calling her names, slapping her, and forcibly ripping out some of her hair. In response to the mother's demand that he leave the home, the father allegedly urinated in a bathtub before departing. Shortly thereafter, the mother discussed the incident with a therapist, who reported it to ACS.
On the date ACS filed the petition, the Family Court held an initial conference. The mother, who was not named as a respondent, appeared at the conference, while the father did not. During the conference, ACS advised the court that the father "did not reside in the home" with the mother and the child, although he "would occasionally sort of show up." ACS requested that the court issue a temporary order of protection in favor of the mother and the child and against the father, while also seeking the child's "release[ ]" to the mother's custody under ACS's supervision. The attorney for the child objected to so much of ACS's request as sought supervision of the mother, who, by counsel, joined in the objection. The court advised the mother that she was "not accused of anything" but nonetheless granted ACS's request in full. By order dated August 31, 2023, the court, inter alia, placed the mother under the supervision of ACS and the court, and directed the mother to cooperate with ACS in certain respects. Specifically, the court required the mother to "maintain[ ] contact with ACS, permit[ ] [ACS's staff members] to make announced and unannounced visits to the home, and accept[ ] any reasonable referrals for services." The mother appeals.
II. The Issue Presented Falls Within the Exception to the Mootness Doctrine and Was Preserved for Our Review
Initially, although we agree with ACS's contention that the issues raised on this appeal have been rendered academic, we reject ACS's assertion that this appeal should be dismissed on that basis. On January 22, 2024, months after issuing the order appealed from, the Family Court issued an order of fact-finding and disposition that, among other things, awarded the mother sole legal and physical custody of the child. "It is a fundamental principle of our jurisprudence that the power of a court to declare the law only arises out of, and is limited to, determining the rights of persons which are actually controverted in a particular case pending before the tribunal" (C.F. v New York City Dept. of Health & Mental Hygiene, 191 AD3d 52, 61 [internal quotation marks omitted]). "Under the mootness doctrine, a court is ordinarily precluded from considering questions which, although once live, have become moot by passage of time or change in circumstances" (Matter of Angel S. [Sadetiana J.], 173 AD3d 1188, 1189 [internal quotation marks omitted]). Since the order of fact-finding and disposition resolved this proceeding and effectively terminated the directives challenged by the mother (see Family Ct Act § 1088), the issues raised on this appeal have been rendered academic (see Matter of Abbygail G. [Christine Y.—Karen M.], 177 AD3d 878, 880; Matter of Angel S. [Sadetiana J.], 173 AD3d at 1189; Matter of Raven K. [Adam C.], 130 AD3d 622, 624).
Nonetheless, we agree with the mother and the attorney for the child that the exception to the mootness doctrine applies here. "If academic, an appeal is not to be determined unless it falls within the exception to the doctrine that permits courts to preserve for review important and recurring issues which, by virtue of their relatively brief existence, would otherwise be nonreviewable" (Matter of Abbygail G. [Christine Y.—Karen M.], 177 AD3d at 880 [internal quotation marks omitted]). In other words, "[t]he exception to the mootness doctrine permits judicial review where the case presents a significant issue which is likely to recur and evade review" (Matter of Darcy M. [Gethylee C.], 195 AD3d 719, 720). Specifically,
"[t]he exception to the mootness doctrine is properly applied where there is '(1) a likelihood of repetition, either between the parties or among other members of the public; (2) a phenomenon typically evading review; and (3) a showing of significant or important questions not previously passed on, i.e., substantial and novel issues'" (Matter of Chang v Maliq M., 154 AD3d 653, 654, quoting Matter of Hearst Corp. v Clyne, 50 NY2d 707, 714-715).
Here, the issue presented—whether certain provisions of the Family Court Act authorize a court in an article 10 proceeding to subject a nonrespondent custodial parent to supervision by a child protective agency when the respondent parent resides elsewhere and the child is not removed from the home—is "capable of repetition" in other cases (Matter of Lucinda R. [Tabitha L.], 85 AD3d 78, 84; see Matter of Carmen R. v Luis I., 160 AD3d 460, 461). The Family Court, Kings County, recently considered the issue and observed that, in article 10 proceedings, ACS regularly seeks "an order of protection against the respondent, and an order releasing the child to the non-respondent parent, with ACS supervision," in circumstances where "the child [resides] exclusively with the nonrespondent parent prior to ACS filing a case against the noncustodial, respondent parent" (Matter of Danna T. [Miguel T.], 82 Misc 3d 723, 726 [Fam Ct, Kings County] [internal quotation marks omitted]; see Matter of A.B. [B.F.], 74 Misc 3d 1229[A], 2022 NY Slip Op 50251[U], *1 [Fam Ct, Oswego County]). Although the issue was decided against ACS in that case, the court noted that, in its opinion, the relevant statute "ha[d] been misunderstood and misapplied in countless cases" (Matter of Danna T. [Miguel T.], 82 Misc 3d at 725). Further, this appeal involves a phenomenon that will typically evade appellate review, since the type of temporary ACS supervision at issue will ordinarily only remain in effect for a limited time period (see Matter of Emmanuel B. [Lynette J.]., 175 AD3d 49, 54; Matter of Elizabeth C. [Omar C.], 156 AD3d 193, 202; Matter of Anthony H. [Karpati], 82 AD3d 1240, 1241). We note that, contrary to the suggestion of ACS, "[t]he correct standard is whether the issue 'typically'—not 'necessarily'—evades review" (Matter of Crawford v Ally, 197 AD3d 27, 32, citing Matter of Hearst Corp. v Clyne, 50 NY2d at 715). The mother's argument also presents "a substantial and novel issue of statewide importance" (Matter of Elizabeth C. [Omar C.], 156 AD3d at 202), which "has not been the subject of prior appellate review" (Matter of Anthony H. [Karpati], 82 AD3d at 1241; see Cellular Tel. Co. v Village of Tarrytown, 209 AD2d 57, 64).
Moreover, contrary to ACS's contention, the mother's argument is preserved for appellate review (see Matter of Victoria B. [Jonathan M.], 164 AD3d 578, 581). Under the circumstances presented, the attorney for the child's objections to ACS's proposed directives, which the mother adopted, "were sufficient to alert [the Family] Court to the relevant question and [thus] sufficiently preserved the legal issue for appellate review" (Geraci v Probst, 15 NY3d 336, 342). We therefore reach the merits of this appeal.
III. The Family Court Improperly Imposed Supervision and Cooperation Directives upon the Mother
A. The Plain Text of Family Court Act § 1017 Did Not Authorize the Family Court's Directives
"[The] Family Court is a court of limited jurisdiction that cannot exercise powers beyond those granted to it by statute" (Matter of Johna M.S. v Russell E.S., 10 NY3d 364, 366; see Matter of Capruso v Kubow, 226 AD3d 680, 682). Stated otherwise, the Family Court may not issue a directive or decide a particular issue "in the absence of any express grant of authority by statute" (Matter of Donald QQ. v Stephanie RR., 198 AD3d 1155, 1157; see Matter of Haber v Strax, 136 AD3d 911, 913). Similarly, the Family Court's "general parens patriae responsibility to do what is in the best interests of the children . . . cannot create jurisdiction . . . not provided by statute" (Matter [*2]of Zavion O. [Donna O.], 173 AD3d 28, 35 [citation and internal quotation marks omitted]).
Here, although the Family Court did not set forth the statutory basis for its challenged directives, the parties focus on Family Court Act §§ 1017 and 1027(d), disagreeing as to whether these statutes provided the court with authority to subject the mother to supervision by ACS and the court, or authority to require her to cooperate with ACS in various ways. As a result, we consider whether those statutes expressly authorized the court to issue those directives (see Matter of Zavion O. [Donna O.], 173 AD3d at 35; Matter of Haber v Strax, 136 AD3d at 913).
"It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature" (Patrolmen's Benevolent Assn. of City of N.Y. v City of New York, 41 NY2d 205, 208). "As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereto" (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583; see Matter of Lisa T. v King E. T., 30 NY3d 548, 552). "[W]here the statutory language is clear and unambiguous, the court should construe it so as to give effect to the plain meaning of the words used" (Matter of D.L. v S.B., 39 NY3d 81, 87 [internal quotation marks omitted]). However, "[a]n examination of the legislative history is proper 'where the language is ambiguous or where a literal construction would lead to absurd or unreasonable consequences that are contrary to the purpose of the enactment'" (Saul v Cahan, 153 AD3d 951, 952, quoting Matter of Auerbach v Board of Educ. of City School Dist. of City of N.Y., 86 NY2d 198, 204). Indeed, "[a]ny statute or regulation . . . must be interpreted and enforced in a reasonable . . . manner in accordance with its manifest intent and purpose" (Matter of Sabot v Lavine, 42 NY2d 1068, 1069). Thus, "'[a] court should avoid a statutory interpretation rendering the provision meaningless or defeating its apparent purpose'" (Matter of Carver v Nassau County Interim Fin. Auth., 142 AD3d 1003, 1008, quoting Miglino v Bally Total Fitness of Greater N.Y., Inc., 92 AD3d 148, 157, affd 20 NY3d 342). "Finally, it is well settled that a statute must be construed as a whole and that its various sections must be considered with reference to one another" (Matter of Albany Law School v New York State Off. of Mental Retardation & Dev. Disabilities, 19 NY3d 106, 120).
"Family Court Act § 1017 sets out the steps to be followed in determining the appropriate placement of a child when the child is initially removed from his or her home" (Matter of Paige G. [Katie P.], 119 AD3d 683, 684; see Matter of Lucinda R. [Tabitha L.], 85 AD3d at 86-87). Specifically, upon "determin[ing] that a child must be removed from his or her home" and securing a report from "the local commissioner of social services," the court must consider "whether there is a non-respondent parent, relative or suitable person with whom such child may appropriately reside" (Family Ct Act § 1017[1][a], [c][i]; see Matter of Timothy GG. [Meriah GG.], 163 AD3d 1065, 1068; Matter of Paige G. [Katie P.], 119 AD3d at 684). Upon finding "that the child may appropriately reside with a non-respondent parent," the court may "temporarily release the child directly to such non-respondent parent" so long as he or she "submits to the jurisdiction of the court with respect to the child" (Family Ct Act § 1017[2][a][ii]; [3]; see Matter of Emmanuel B. [Lynette J.], 175 AD3d at 59; Matter of Angel S. [Sadetiana J.], 173 AD3d at 1188). The order releasing the child to the nonrespondent parent "shall set forth the terms and conditions" that apply, which, as relevant to this appeal, "may include . . . a direction for [the nonrespondent parent] to cooperate in making the child available . . . for appointments with and visits by the child protective agency, including visits in the home and in-person contact with the child protective agency" (Family Ct Act § 1017[3]; see Matter of D.L. v S.B., 39 NY3d at 90-91).
Contrary to ACS's contention, Family Court Act § 1017 did not provide the Family Court with authority to subject the mother to supervision by ACS and the court, or to require her to "cooperate" with ACS in the manner directed in the order appealed from (see Matter of Danna T. [Miguel T.], 82 Misc 3d at 726-728). Considering the "plain meaning" of the text and construing the statute's "various sections . . . with reference to one another" (Matter of Jefry H., 102 AD3d 132, 136 [internal quotation marks omitted]), the relevant provisions of Family Court Act § 1017 apply only when a court orders the removal of a child from his or her home and releases the child to the home of a nonrespondent and "noncustodial parent" (Matter of D.L. v S.B., 39 NY3d at 91). By the plain language of the statutory text, the provisions requiring the nonrespondent parent, inter alia, to "submit[ ] to the jurisdiction of the court with respect to the child" and "to cooperate" with "the child protective agency" in various ways (Family Ct Act § 1017[3]) are only triggered "[a]fter [the] child is removed from the home" (Matter of Emmanuel B. [Lynette J.], 175 AD3d at 59; see Matter of Paige G. [Katie P.], 119 AD3d at 684). Here, since the court never "determin[ed] that [the] child [*3]must be removed from . . . her home" (Family Ct Act § 1017[1]), it did not have authority pursuant to Family Court Act § 1017 to impose the challenged directives upon the mother, no matter how "well-intended" the court's "goals" may have been (Matter of Zavion O. [Donna O.], 173 AD3d at 35).
B. The Legislative History Supports the Conclusion that the Family Court's Directives Were Improper
Although we need not review the legislative history of Family Court Act § 1017 because the statutory text is unambiguous and a "literal construction" thereof does not "lead to absurd or unreasonable consequences that are contrary to the purpose of the [statute]" (Saul v Cahan, 153 AD3d at 952 [internal quotation marks omitted]), the legislative history nonetheless supports our conclusion.
Since "the institution of the family is deeply rooted in this Nation's history and tradition," and it is the vehicle through which "we inculcate and pass down many of our most cherished values, moral and cultural" (Moore v East Cleveland, 431 US 494, 503), it has long been recognized "that freedom of personal choice in matters of family life is a fundamental liberty interest" (Santosky v Kramer, 455 US 745, 753). Indeed, "a parent's interest 'in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests'" (Matter of F.W. [Monroe W.], 183 AD3d 276, 280, quoting Troxel v Granville, 530 US 57, 65; see Matter of Elizabeth C. [Omar C.], 156 AD3d at 203). "Similarly, . . . children have a parallel right to be reared by their parent" (Matter of F.W. [Monroe W.], 183 AD3d at 280 [alteration and internal quotation marks omitted]). Nonetheless, a parent's "interest in . . . family integrity . . . is counterbalanced by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves" (Wilkinson v Russell, 182 F3d 89, 104 [2d Cir] [internal quotation marks omitted]).
Against those background principles, article 10 of the Family Court Act, which includes Family Court Act § 1017 and which pertains to child protective proceedings, "erects a careful bulwark against unwarranted state intervention into private family life, for which its drafters had a deep concern" (Matter of Jamie J. [Michelle E.C.], 30 NY3d 275, 284 [internal quotation marks omitted]). Therefore, "the child protective statutes of Family Court Act article 10 have a twofold purpose: 'to establish procedures to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being,'" while also "'provid[ing] . . . due process of law for determining when the state, through its family court, may intervene against the wishes of a parent on behalf of a child so that his [or her] needs are properly met'" (Matter of Elizabeth C. [Omar C.], 156 AD3d at 204, quoting Family Ct Act § 1011). Stated more succinctly, the "purpose of article 10 [is] to provide a mechanism to protect children while preserving parental rights" (id. at 209).
The competing purposes of article 10 make clear that the Legislature sought to strike a balance between protecting children through "state intervention" while simultaneously shielding "private family life" from such intervention when it is "unwarranted" (Matter of Jamie J. [Michelle E.C.], 30 NY3d at 284 [internal quotation marks omitted]; see Matter of Elizabeth C. [Omar C.], 156 AD3d at 204). This makes sense, among other reasons, because a child protective agency's involvement with a family may itself have a negative impact on the parent or the child, even if it may be necessary in some circumstances to prevent or repair the effects of abuse or neglect. An ACS investigation, by its nature, intrudes upon the private lives of the parent and child to one degree or another (see Matter of Isabela P. [Jacob P.], 195 AD3d 722, 723; Matter of Anthony JJ. v Joanna KK., 182 AD3d 743, 744) and, at least on occasion, may be traumatic for both the child and the parent (see Matter of Duran v Contreras, 227 AD3d 1068, 1070; Matter of Daniel D. [Diana T.], 183 AD3d 727, 728). Indeed, in testimony to a New York City Council committee in 2020, the then Commissioner of ACS acknowledged that, while the agency's work in responding to reports of abuse and neglect "may be an essential lifeline for children when they are being seriously harmed or at imminent risk of harm, the child protective response and investigation by its nature can be intrusive and traumatic for families" (Written Testimony of David A. Hansell, NY City Council, Comm on General Welfare, Oct. 28, 2020, at 6, available at https://www.nyc.gov/assets/acs/pdf/testimony/2020/GWCommitteeHearing.pdf [last accessed Dec. 27, 2024]). Considering the intrusive and potentially traumatic impact of ACS involvement in a family's life, the disproportionate involvement of Black and Hispanic children in the child welfare [*4]system cannot be ignored (see id. at 2-6).
In any event, in furtherance of the goal of "safeguard[ing] the [child's] physical, mental and emotional well-being," Family Court Act § 1017 "help[s] the child . . . maintain[ ] family ties and reduc[es] the trauma of removal" by placing him or her with a nonrespondent parent or "suitable relative" (Matter of Harriet U. v Sullivan County Dept. of Social Servs., 224 AD2d 910, 911; see Matter of Richard HH. v Saratoga County Dept. of Social Servs., 163 AD3d 1082, 1083). Notably, in 2015, the Legislature enacted sweeping legislation that amended various statutes, including Family Court Act § 1017, in order to provide nonrespondent parents with "greater participation in abuse or neglect proceedings," while "also expand[ing] the options available to Family Court judges" when "craft[ing] appropriate orders respecting the rights of non-respondent parents [and] assuring the safety and well being of children who are the subjects of the proceedings" (Assembly Memo in Support, Bill Jacket, L 2015, ch 567 at 7). Among other things, the legislation "clarifie[d] the language of Family Court Act § 1017 by referring specifically to 'non-respondent parent, relative or suitable person' as potential resources a court may consider after determining that a child must be removed from his or her home" (id. at 8).
Here, considering that article 10 serves, in part, to enact procedures preventing unwarranted state intervention in family life, and that the relevant provisions of Family Court Act § 1017, in particular, serve to help the child maintain family ties while respecting the rights of parents (see Matter of Jamie J. [Michelle E.C.], 30 NY3d at 284; Matter of Harriet U. v Sullivan County Dept. of Social Servs., 224 AD2d at 911; Assembly Memo in Support, Bill Jacket, L 2015, ch 567 at 7), ACS's position is necessarily at odds with the statute's legislative purpose. The challenged directives constitute precisely the type of state intervention that the Legislature sought to avoid in circumstances when it is not warranted, particularly considering the impact ACS involvement can have on a child or a parent. It is also unclear how a nonrespondent custodial parent's rights would be respected by placing his or her parenting of a child under ACS supervision. Nor does interpreting Family Court Act § 1017 in a manner that permits ACS supervision of a nonrespondent custodial parent in the circumstances presented help a child to maintain family ties, since the child is necessarily already in the custody of that parent in such circumstances.
C. Family Court Act § 1027(d) Did Not Authorize the Challenged Directives
Further, the relevant provisions of Family Court Act § 1017 did not apply indirectly to the circumstances presented by way of the reference within Family Court Act § 1027(d) to Family Court Act § 1017(2)(a)(ii).
Pursuant to Family Court Act § 1027(a)(i), (ii), and (iii), a hearing to determine "whether the child's interests require protection" must be held, or may be held, depending upon the circumstances. "Upon such hearing, the court may, for good cause shown, release the child to his or her parent or other person legally responsible for his or her care, pending a final order of disposition, in accord with [Family Court Act § 1017(2)(a)(ii)]" (id. § 1027[d]).
Contrary to ACS's contention, even assuming the initial conference at issue constituted such a hearing, Family Court Act § 1027(d) does not provide an independent basis for a court to place a nonrespondent custodial parent under ACS supervision when the child has not been removed from that parent's home and the respondent parent resides elsewhere. Instead, by expressly referring to a subparagraph of Family Court Act § 1017, which, as previously stated, only applies to a nonrespondent parent in such circumstances "[a]fter [the] child is removed from the home" (Matter of Emmanuel B. [Lynette J.], 175 AD3d at 59), Family Court Act § 1027(d) similarly only applies in such circumstances. This is not only the plain meaning of the statutory text, but it is also consistent with the Legislature's recognition that the reference to Family Court Act § 1017 within Family Court Act § 1027(d) serves to establish the former statute as the "authority" for permitting a court to "release a child to his or her parent" during the pendency of an article 10 proceeding (Assembly Memo in Support, Bill Jacket, L 2015, ch 567 at 9).
D. This Court's Decision in Matter of Elizabeth C. (Omar C.) Does Not Support ACS's Position
This Court's determination in Matter of Elizabeth C. (Omar C.) (156 AD3d 193) does not warrant a different result. In that case, ACS accused the respondent father, who resided in a home with his children and the nonrespondent mother, of abusing and neglecting the children (see id. at 196-197). The father sought a hearing pursuant to Family Court Act § 1028 to contest a temporary order of protection issued on the same day that ACS filed the petitions, which required [*5]him to stay away from the family home (see Matter of Elizabeth C. [Omar C.], 156 AD3d at 196-197). Although Family Court Act § 1028 sets forth standards for conducting hearings to determine whether to "return[ ] [a] child" after his or her "removal . . . from the home" (id. § 1028[a], [b]), the father asserted "that his loss of the physical care and custody of the children incidental to his exclusion from the family home was the functional equivalent of a removal of the children, thereby entitling him to the heightened due process afforded by a section 1028 hearing" (Matter of Elizabeth C. [Omar C.], 156 AD3d at 197). The Family Court disagreed, concluding that such a hearing is "only appropriate where . . . children have been physically removed from their residence" (id. at 198). On appeal, this Court reversed (see id. at 205-210). While recognizing "that the statutes within part 2" of article 10 of the Family Court Act "generally employ the term 'removal' in the context of physically removing the child from his or her home," this Court also noted that there was "no language in any of the statutes [that] expressly limit[ed] the due process protections they contain . . . only [to] situations involving . . . physical removal" (id. at 205-206). "Since the removal of a child from the family home and the exclusion of a parent from that same home require equal showings of imminent risk, and both result in similar infringements on the constitutionally protected parent-child relationship," this Court "conclud[ed] that both trigger the same due process protections" (id. at 207).
Contrary to ACS's contention, our holding in that case does not lead to the conclusion that, in this case, the child was "removed" for purposes of Family Court Act § 1017, thereby permitting the Family Court to impose the challenged directives upon the mother. In Matter of Elizabeth C. (Omar C.), this Court was focused on a different question than the one presented here: whether a custodial parent's exclusion from the family home triggers the hearing and due process requirements set forth in Family Court Act § 1028, even when the child is still residing at, and has not been removed from, the home. In this case, the question is instead whether Family Court Act § 1017—the relevant provisions of which require a noncustodial nonrespondent parent to, among other things, cooperate with a child protective agency upon assuming temporary custody after the child has been removed from the child's home—can be utilized to impose the type of directives at issue upon a custodial nonrespondent parent when an order of protection has been issued against a respondent parent who resides elsewhere, and when the child has not been removed from the nonrespondent parent's home. Notably, in Matter of Elizabeth C. (Omar C.), this Court did not state that the circumstances presented involved an actual "removal" of the child, as that term is utilized in Family Court Act § 1028. Instead, we reasoned that
"[t]he issuance of a full stay away order of protection excluding the father from the family home . . . [wa]s for all practical purposes akin to a physical removal of the children from his care and custody, . . . produc[ing] the same cessation in his contact with the children, and the same severance of his relationship with them, that an order removing the children from the family residence would bring about,"
thereby involving the "same constitutional considerations" (Matter of Elizabeth C. [Omar C.], 156 AD3d at 208-209).
IV. The Issue of the Due Process Protections Available to Respondent Parents Is Not Before Us
To be clear, our conclusion that Family Court Act §§ 1017 and 1027(d) did not authorize the Family Court to impose the challenged directives upon the mother under the circumstances presented should not be construed as indicating that certain hearing and due process provisions of Family Court Act article 10 were unavailable to the father. That issue is not before us on this appeal, and we do not decide it.
V. Conclusion
Accordingly, the Family Court improperly placed the mother under the supervision of ACS and the court, and directed her to cooperate with ACS in certain respects.
In light of our determination, we need not reach the remaining contentions of the parties and amici curiae.
Accordingly, the order is reversed insofar as appealed from, on the law.
CHAMBERS, J.P., BRATHWAITE NELSON and DOWLING, JJ., concur.
ORDERED that the order is reversed insofar as appealed from, on the law, without costs or disbursements.
ENTER:
Darrell M. Joseph
Clerk of the Court